**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**William C. SIMPSON,
Defendant-Appellant.**

No. 82–1275.

United States Court of Appeals,
Fifth Circuit.

June 30, 1983.

Certiorari Denied Oct. 31, 1983.
See 104 S.Ct. 360.

904

Alan Brown, San Antonio, Tex., Frederick R. Zlotucha (Court-appointed), San Antonio, Tex., for defendant-appellant.

William C. Simpson, pro se.

Edward C. Prado, U.S. Atty., Sidney Powell, Asst. U.S. Atty., San Antonio, Tex., Louis M. Fischer, Atty., Appellate Sect., Crim. Div., Washington, D.C., for plaintiff-appellee.

Before GARZA, RANDALL and GARWOOD, Circuit Judges.

GARZA, Circuit Judge:

Defendant-appellant, William Simpson, appeals from his conviction after a jury trial on two counts in a three-count indictment. Count one charged Simpson with conspiring to import Phenyl-2-Propanone (P2P) into the United States in violation of 21 U.S.C. § 952(a). Count two charged appellant with conspiring to possess P2P with intent to distribute it in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846. Appellant was found guilty on the first two counts and not guilty on count three which charged a conspiracy to manufacture methamphetamine. The evidence established that between November 1980, and January 1982, appellant Simpson, co-defendant Richmond Harper (who pled guilty to a reduced charge) along with various other individuals conspired to import and possess P2P, a precursor for methamphetamine. Their scheme was eventually frustrated when their smuggler, Roger Frazier, turned confederate and revealed their operation to DEA agents.

The scheme began in late 1980 when Harper, Simpson and a business associate of Simpson, Walter Odom, discussed the possibility of using Harper's contacts in Mexico to import P2P. In December, Harper contacted Roger Frazier to fly seven 5-gallon cans of phenyl ethyl alcohol back to the United States and to deliver them by car to the appellant and Harper in Houston on December 13, 1980. Frazier stated that he had been told that the shipment consisted of a legal type of alcohol. The other members of the conspiracy, according to Harper, believed the shipment to be P2P; Harper, however, who had arranged the pickup, knew that in fact the shipment contained only phenyl ethyl alcohol, a substance which when "cooked" can be converted to P2P. In Houston, one can of alcohol was given to defendant Simpson allegedly to be delivered to Odom for testing. Two others were taken by Harper and Frazier to Brenham, Texas, where they were instructed by another alleged conspirator, Walter Flanagan, to be taken to Willis, Texas. When it became apparent that the alcohol could not be sold as P2P, Harper agreed to continue looking for some P2P to purchase from his Mexican contacts.

In January, the appellant solicited Frazier to make another flight to Mexico in which he received a small package containing white powder and pills. Frazier had been told that this delivery would be a delivery of a sample of alcohol which could be sold at profit in the United States.

Simpson stated that it contained "crystal," a slang term for methamphetamine, and "quaaludes." After this trip, Frazier got uncomfortable and contacted the DEA.

Up to this point the scheme had failed to produce any substance which the parties could sell at a profit. Frazier and appellant met twice during February in taped meetings discussing various drug related activities. At one meeting, Simpson discussed the possibility of cooking or converting the December shipment of alcohol into P2P using a formula provided by a friend of Odom. The parties agreed, at Simpson's suggestion, to use code names in future discussions. On March 3, Frazier called appellant and informed him that he had a friend who might be able to undertake the conversion. At this meeting, appellant claimed to have taken a sample to Mexico where certain individuals with a lab had provided him with a conversion formula. He also claimed to have a buyer in Houston. Nothing further, however, arose from these discussions.

Two months later, Harper contacted Frazier and asked him to pick up ten cans of alcohol in Sabinas, Mexico and bring them back across the border. This transaction also fell through, however.

In September, Frazier met twice with the appellant. At these meetings, Frazier offered and the appellant agreed to examine a sample of P2P which Frazier claimed his friend could get for a possible resale. In a meeting on October 20, undercover DEA Agent Jane Ann Herber informed appellant that she could obtain P2P at the oil company lab where she worked. When informed by Herber that it was illegal to even possess P2P, appellant laughed and said that just their discussion about it constituted a conspiracy. They agreed that appellant would take a plane flight to Dallas the following Saturday to meet Herber. On the said day, however, appellant grew weary, took a later flight, and arrived only to inform Herber that he had changed his mind because he thought she might be an informant. When Herber asked what she should do, appellant told her to "go ahead [and] get it together,"

which Herber took to mean to collect the agreed-to five gallons of P2P.

Nothing occurred again until December when Herber called appellant to tell him that she had collected the P2P. Appellant told her to give him ten days to locate a buyer. The next day Harper called Frazier to say he was interested in the P2P. Frazier, Herber and Harper arranged a meeting where a sample of P2P was exchanged on December 7. When the sample tested perfectly, a meeting was scheduled for January 7 for the exchange of the five gallons of P2P. At the meeting, Harper had only half the purchase price requiring him to leave the meeting for a short time allegedly to meet with the person who had the remaining amount. At trial, Harper testified that he had the money in his car but that he called Simpson and arranged to meet him briefly before undertaking the purchase. The exchange thereafter took place, Harper drove the P2P to the home of another alleged conspirator, Walter Flanagan, and was thereafter arrested. Simpson, likewise, was subsequently arrested.

On appeal, Simpson raises numerous grounds of error which he argues require reversal of his conviction. His principal argument rests in his claim that his trial was prejudiced by multiple instances involving the introduction of extrinsic evidence or improper testimony. We have carefully examined the record with respect to each item about which appellant claims error, and we find that considered individually, and as a whole, there is no error warranting reversal of appellant's conviction. There are four principal items of evidence, the admission of which appellant challenges. These include: (1) testimony concerning other drugs or drug-related items not part of the charge against Simpson; (2) evidence concerning Simpson's involvement in an S.E.C. judgment against Simpson and his associate Odom; (3) introduction of alleged probation violations by Simpson; and (4) "second conspiracy" testimony. We find that none of this evidence was improper, and to the extent that any evidence was arguably im-

properly admitted, such was harmless beyond a reasonable doubt.

With respect to evidence concerning references to "pills and vials, quaaludes, cocaine sales, etc.," the record reveals that such testimony was in fact part and parcel of the conspiracy itself. For example, testimony concerning pills, vials, powder and quaaludes was introduced as part of the February 6, 1981, taped conversation between Frazier and Simpson. It is to be noted that these references were made by Simpson himself and were intertwined with his references to the two shipments which Frazier had brought into the United States, both of which supposedly contained P2P or "crystal." The February 6 conversation chiefly centered on the P2P conspiracy. Other references to drugs about which appellant complains, when read in context, also centered around the P2P conspiracies.

■ Evidence of "an uncharged offense arising out of the same transaction or series of transactions as the charged offense is not an 'extrinsic' offense within the meaning of rule 404(b)" and is thus admissible. *United States v. Gonzalez,* 661 F.2d 488, 493–94 (5th Cir.1981); *see United States v. Brooks,* 670 F.2d 625, 628–29 (5th Cir.1982); *United States v. Kloock,* 652 F.2d 492, 494 (5th Cir.1981); *United States v. Wilson,* 578 F.2d 67, 72–73 (5th Cir.1978). Even if subject to Rule 404(b), it is apparent that Simpson's own statements were probative to establish intent—the only element of the count one offense which Simpson's defense sought to challenge. *See, United States v. Brugman,* 655 F.2d 540, 545 (4th Cir.1981) (reference to drugs, other than cocaine involved in the charge, which was "part and parcel of conversations" admissible under Rule 404(b)). Furthermore, the trial court was most careful to caution the jury that the defendant was on trial only for conduct alleged in the offense. This testimony was not erroneously admitted.

Simpson, however, also challenges the introduction into evidence of a civil injunction obtained by the Securities & Exchange Commission involving his participation in a Louisiana oil company. Appellant argues that because the securities violations involved did not result in a criminal conviction, the use of the default judgment to impeach him violated Fed.R.Evid. 609.

■ Throughout his testimony, Simpson claimed that he was a legitimate businessman involved in legitimate transactions with Harper. He claimed that his inculpating conversations with Frazier and DEA agent Herber were merely role playing in order to safeguard his investment in Harper. A number of witnesses testified concerning Simpson's trustworthiness as a businessman. The government argues that the SEC judgment was permissible impeachment under Fed.R.Evid. 608(b)[1] in that it tended to refute appellant's claims that he was only involved in legitimate transactions and was in fact an honest and a legitimate businessman. Such testimony placed into issue appellant's character for truthfulness or untruthfulness. The government did not err in questioning the defendant in this manner. *See also* Fed.R. Evid. 405(a).

■ Although Rule 608(b) permits a party to cross-examine a witness concerning specific instances of misconduct affecting one's veracity other than a criminal conviction, the rule expressly prohibits proof of such misconduct by extrinsic evidence. The cross-examining attorney must take the witness' answer. *United States v. Herzberg,* 558 F.2d 1219, 1223 (5th Cir.), *cert. denied,* 434 U.S. 930, 98 S.Ct. 417, 54

---

1. Fed.R.Evid. 608(b) states:

   Specific instances of conduct. Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

L.Ed.2d 290 (1977); 3 Weinstein's Evidence ¶ 608[05]. In this case, the government read and introduced into evidence the S.E.C. injunction. Such extrinsic evidence arguably is inadmissible, see, *United States v. Herzberg, supra;* however, it has been held that the Rule 608(b) prohibition against extrinsic evidence is not applicable unless the defendant *denies* his prior misconduct. *Carter v. Hewitt,* 617 F.2d 961, 969–71 (3rd Cir.1980). In this case, Simpson admitted his involvement simultaneously with the introduction of the evidence. No error was thus committed. We add, however, out of an abundance of precaution for appellant's rights, that we have reviewed the testimony and are convinced that such testimony, even were we to find it erroneous, was harmless. In the context of the entire record and the evidence inculpating the defendant, such testimony could not have influenced the jury's result. *See, United States v. Herzberg, supra.*

Simpson next assigns error to the admission of evidence of "alleged violations of probation by defendant." At trial the government, on cross-examination, was permitted to properly impeach Simpson with evidence concerning his 1977 conviction for conspiring to transport in interstate commerce stolen goods; on direct examination, this conviction together with its sentence and term of probation had been revealed to the jury. Simpson contends that it was improper for the government to cross-examine him concerning whether he reported potential probation violations to his probation officer. The violations which the government raised related to appellant's failure to report the scheme, which even Simpson admitted was illegal, involving the P2P purchase.

■ The government contends that such questions were permissible impeachment under Fed.R.Evid. 608(b) and were relevant to establish intent under Fed.R.Evid. 404(b). We agree. In examining this testimony, we note the purpose for which it was offered. Simpson's defense at trial was that he did not possess the requisite criminal intent to be convicted of conspiracy. He claimed

with respect to count one that he was aware at all times that the substances being imported were not P2P. He claimed to be a part of a scam with Harper in which they intended to fraudulently sell such substances as P2P. It was Simpson's contention that at any time when actual P2P was mentioned, he strenuously objected to any possible transaction. He further contended that his conversations with Frazier and Herber were mere role playing to keep Frazier, to whom Harper and Simpson owed $5,000, happy and additionally, to keep his legitimate transactions with Harper alive so that he might recoup his investments in these dealings. As for count two, Simpson further asserted his innocent state of mind contending that when Harper discussed the purchase of P2P from Herber, Simpson complained and thereafter disassociated himself with the illegal transaction.

The questions which the government asked sought only to establish if Simpson ever told or considered telling his probation officer, as required by his terms of probation, about the illegal conduct of which he was aware. If indeed Simpson possessed the purity in heart which he claimed, such reports would logically have corroborated his story and supported his claim as to absence of criminal intent. Conversely, his failure to report such items cast doubt upon his innocent assertions and suggested that in fact he was a knowing and willing participant in the crime. We find no error in the admission of this testimony.

■ The fourth major item of evidence which appellant challenges concerns alleged "second conspiracy" testimony. Simpson claimed at trial that he had nothing to do with the actual sale of P2P from Agent Herber to Harper. He claimed and attempted to establish that he disassociated himself totally with the only transaction in which an illegal drug was actually involved. Accordingly, Simpson contends that testimony concerning this "second conspiracy" between Frazier, Herber and Harper to purchase P2P was inadmissible against him. Again, we disagree.

First of all, the testimony to which appellant objects was all relevant to establish the government's case on counts two (possessing P2P) and three (manufacturing methamphetamines). Furthermore, there was significant testimony connecting Simpson to the conspiracy. As previously noted, between November 1980 and February 1982, there existed an ongoing conspiracy to obtain P2P among defendant and his cohorts. With specific reference to the alleged "second conspiracy"—a term which appellant's counsel has coined—the record is complete with evidence connecting Simpson to the transaction. It was Simpson who first discussed with Frazier the possibility of purchasing P2P from Herber when Frazier informed Simpson that his "friend" might be able to obtain some from her company. Having agreed with Frazier to pursue that possible avenue, Simpson met with Frazier and Herber to discuss the purchase of P2P. At this meeting, Simpson indicated his interest and in fact joked with Herber that their discussion about a P2P sale by itself constituted a conspiracy. At this same meeting, a place for delivery of a sample of P2P was, at Simpson's insistence, scheduled for October 24, 1981, in Dallas. Simpson apparently grew weary of Herber's possible informant status and thus attempted to cancel the scheduled pickup by arriving late in Dallas on the designated day. When Herber still met him on the later flight and he declined her offer, Simpson nevertheless told Herber to "go ahead [and] get it together." When Herber later called Simpson and he again declined to deal with her, he again implicated himself by requesting ten days during which he might be able to locate a buyer. Indeed, the very next day, Simpson's partner, Harper, contacted Frazier to indicate his interest in purchasing the P2P. While the evidence indicates that Simpson did not want to personally deal with Herber, his connection to the transaction carries through its conclusion. In December, after Simpson had allegedly withdrawn, Harper informed Frazier that Simpson held $5,000 of the money to be used to purchase the P2P. On the day in which Herber and Frazier delivered the P2P to Harper, Simpson was called by Harper. At one point in the delivery process, Harper left the hotel room where he was meeting with Herber and Frazier, to meet Simpson and discuss several unidentified matters with his partner. It is to be noted that Harper was driving a car registered in title to Simpson's wife. Harper testified that the money used to purchase the P2P had been kept in this car. Finally, Harper testified that Simpson would have shared in any profits made from the P2P transaction.

■ Appellant makes several arguments as to why some or all of the "second conspiracy" evidence was inadmissible against him. He first asserts that "the evidence establishes that appellant refused any involvement with government agents in an apparent P2P conspiracy." While it is true that Simpson declined at one point to deal any further on a personal basis with Agent Herber, any contention that he was not involved in the "second conspiracy" is refuted by the above cited testimony. That the evidence was sufficient to support appellant's conviction on conspiracy to possess P2P is clear. *See United States v. Pozos,* 697 F.2d 1238, 1241 (5th Cir.1983).

■ Appellant contends that statements of co-conspirator Harper were inadmissible against him because there was an insufficient showing by independent evidence of his participation in the conspiracy. It is clear, however, from the record that appellant's own statements and acts demonstrated that he participated in the count two conspiracy and that he engaged in affirmative steps to further the conspiracy. The district court reviewed the evidence and made the necessary findings in compliance with Fed.R.Evid. 801(d)(2)(E) and our holding in *United States v. James,* 590 F.2d 575 (5th Cir.1979), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). Under these circumstances, the court's findings were amply justified. *United States v. Leon,* 679 F.2d 534, 540–41 (5th Cir.1982).

Appellant has raised a number of other issues on appeal. We have carefully exam-

ined the entire record, the points of error raised,[2] and the applicable law; and we find no merit to these arguments. Accordingly, the judgment and conviction below are AFFIRMED.

AFFIRMED.

---

2. Appellant has raised ten general points of error, some of which we have previously discussed and none of which merit reversal. These errors include:

   (1) Whether the evidence can sustain a conviction under count one due to legal impossibility;

   (2) Whether the evidence was sufficient to support a conviction on counts one and two;

   (3) Whether the court erred in admitting certain extrinsic and impeachment evidence;

   (4) Whether the court erred by allowing testimony allegedly concerning appellant's state of mind;

   (5) Whether the court erred in denying defendant's motion for mistrial on three specific occasions;

   (6) Whether a mistrial was warranted by the prosecutor's references to counsel's dual representation of Simpson and Harper;

   (7) Whether the prosecutor otherwise committed reversible error in closing argument;

   (8) Whether the court's admonishment of the defendant constituted reversible error;

   (9) Whether the court erred in reinstructing the jury on conspiracy; and

   (10) Whether the court erred in admitting co-conspirator and "second conspiracy" testimony.

These errors were set forth in an opening brief submitted on behalf of Simpson by his court-appointed counsel. Simpson also submitted a pro se reply brief which we have likewise considered. The reply brief essentially supplements appellant's opening brief and attacks the government's characterization of the record.