UNITED STATES of America,
Plaintiff–Appellee,

v.

Nelson DeVARONA,
Defendant–Appellant.

No. 88–5555.

United States Court of Appeals,
Fifth Circuit.

April 18, 1989.

W. Troy McKinney, George J. Parnham, Houston, Tex., for defendants-appellants.

Mervyn Hamberg, Crim. Div., Dept. of Justice, Washington, D.C., LeRoy Morgan Jahn, Asst. U.S. Atty., Helen M. Eversberg, U.S. Atty., Daniel Maeso, Asst. U.S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before THORNBERRY, WILLIAMS and DAVIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Nelson DeVarona appeals his conviction for conspiracy to possess cocaine with intent to distribute on grounds that: (1) a variance existed between the indictment and the government's proof; and (2) the indictment improperly joined his conspiracy count with a substantive possession count against two other defendants. We find no error and affirm.

## I.

### A.

A jury convicted DeVarona on one count of a two-count indictment for conspiracy to possess cocaine with intent to distribute under 21 U.S.C. § 846. Count One alleged a single conspiracy between DeVarona and three co-defendants—Daniel Vilarchao, Jose Fontao, and Ovidio Rodriguez Cantu—running from January 24, 1985 until February 24, 1986. The second count charged only Vilarchao and Fontao with a substantive possession offense under 21 U.S.C. § 841(a)(1). The government tried DeVarona jointly with Fontao; Vilarchao was a fugitive at the time of trial.

DeVarona argues that the single conspiracy charged in the indictment encompasses at least two, and perhaps three, distinct conspiracies including (1) cocaine discovered aboard a speed boat near Miami on January 24, 1985; and (2) efforts to sell cocaine in San Antonio from late December 1985 until February 24, 1986. The government portrays these events as related episodes in a single conspiracy masterminded by Vilarchao to funnel cocaine inland from Miami.

### B.

On January 24, 1985, officers from the Metro–Dade Police Department and the United States Customs Service tracked two speed boats that had stopped together for several minutes off Bimini Island near the Bahamas. The speed boats traveled from Bimini to an inlet just north of Miami Beach; Customs and North Miami Police Department officers began chasing the speed boats as they entered the inlet.

One boat docked at a marina just before the police reached it. Vilarchao, one of the boat's three occupants, produced the registration certificate for another boat when questioned by police. A preliminary search uncovered no drugs.

The second boat crash-landed in a yard further up the waterway; its two occupants escaped before police arrived. A Customs officer noted that the registration number on the second boat matched the number on the form Vilarchao had given him for the first boat. A search of the second boat revealed photocopies of a registration certificate for the first speed boat in co-defendant Fontao's name. Police also discovered about six pounds of cocaine encased in two fiberglas containers.

When police returned to the marina where the first boat was docked, they discovered that the top of the boat's seating area had been tampered with and a large space under the seats was empty. Police seized both boats and moved them to another marina for storage. The government eventually returned the first boat to Fontao.

On February 4, 1985, police discovered that someone had broken into the second boat at the marina. They investigated and found two hidden compartments in the second boat; one was full of fiberglas containers, while the nearly empty second compartment held just a few containers. Police also discovered two more containers floating nearby in the water. Each container held about one kilogram of cocaine.

At trial a Customs agent who participated in the initial chase and a North Miami Police Department vice officer who investigated the marina break-in described the packaging of the cocaine they discovered on the second boat. The watertight packaging method involved wrapping the cocaine in plastic, tinfoil and newspaper, or in a plaster-like substance, and encasing it in fiberglas to create a buoyant cocaine "football" or "brick." Both officers testified that this packaging method was unique in their experience.

## C.

The government presented no evidence of any events occurring between February 4, 1985 and early December 1985. The government says the conspiracy's second episode began in December; DeVarona says the second conspiracy began then.

In late 1985, Mondo Romano, a San Antonio resident, and DeVarona's co-defendant, Cantu, agreed to pursue drug sales in San Antonio. In an effort to find a supplier Cantu contacted Osvaldo Scaffidi, a drug dealer with connections in Texas and Florida. Romano's shaky financial condition prompted him to bring Michael Scudder, a real estate agent with whom Romano previously had conducted legitimate business, into the deal. In later meetings Romano portrayed Scudder—an amateur who got in over his head—as the actual buyer of the cocaine.

When Romano, Scudder, Cantu and Scaffidi met on December 10, 1985, Scaffidi said his contacts from Houston and Florida would come to San Antonio to discuss a large cocaine sale with Scudder. After the meeting Scaffidi contacted DeVarona in Houston; in turn, DeVarona contacted Vilarchao in Miami. DeVarona flew to Miami and met with Vilarchao. On December 13, 1985, Vilarchao and DeVarona flew to San Antonio. Scaffidi picked them up at the airport and the three men went out to dinner.

At dinner Scaffidi told Vilarchao and DeVarona that Scudder wanted to buy ten kilograms of cocaine. Vilarchao described generally his method of smuggling cocaine into Miami using speed boats, and mentioned a trip during which he had dumped 400 kilograms of cocaine into the water so that the police would not catch him with it. Vilarchao also told Scaffidi that Vilarchao and DeVarona had known each other a long time and had been "working together for some time," which Scaffidi understood to mean working together in the drug trade. In addition, Scaffidi testified that DeVarona told him at another meeting that they each would earn $4,000 per kilogram of cocaine.

Although Scudder wanted to back out, Romano continued to negotiate with Scaffidi, DeVarona and Vilarchao. Romano and Cantu pressured Scudder into meeting with Scaffidi, DeVarona and Vilarchao at Scudder's real estate office on December 14, 1985 to negotiate the purchase of ten kilo-

grams of cocaine. Vilarchao said he owned the cocaine but had shipped it to San Antonio according to DeVarona's instructions for Scaffidi to sell. During this meeting Vilarchao and DeVarona quarrelled briefly, after which Vilarchao told DeVarona to be quiet because he, Vilarchao, owned the cocaine and would direct its disposition.

After the meeting, Vilarchao returned to his hotel room, called a partner in Miami, and told him to send co-defendant Fontao with the cocaine from Miami to San Antonio. Fontao drove the cocaine from Miami to San Antonio over the weekend of December 14–15, 1985. On Monday morning, December 16, Fontao drove Vilarchao and DeVarona to Scaffidi's hotel in San Antonio. Fontao asked Scaffidi if he had a tool to loosen the spare tire and gain access to a hidden compartment containing the cocaine. After Scaffidi said he had no such tool, Fontao and Vilarchao drove off and left DeVarona with Scaffidi.

Vilarchao called Scaffidi several hours later and asked Scaffidi to send DeVarona to pick up the cocaine. DeVarona said he felt ill and refused. Scaffidi then went alone to meet Vilarchao in a supermarket parking lot near Scaffidi's hotel, where Vilarchao gave him a paper bag containing one kilogram of cocaine in a fiberglas container. Vilarchao told Scaffidi that he would give Scaffidi and DeVarona the remaining nine kilograms after the first had been sold. At trial, Scaffidi examined a picture of a fiberglas-encased cocaine brick recovered from the Miami marina in February 1985 and testified that it was "almost the same" as the cocaine container he received from Vilarchao in the parking lot.

Scaffidi took the kilogram of cocaine back to his hotel room, where DeVarona cut a small portion of it as a sample for Romano and Cantu. DeVarona described the cocaine as "beautiful." Scaffidi, DeVarona and a third person spent the rest of December 16 in an unsuccessful effort to sell the kilogram of cocaine.

When the three returned to Scaffidi's hotel room they found Vilarchao and Fontao waiting for them. While in the room Vilarchao and DeVarona argued again, during which Vilarchao accused DeVarona of trying to steal the cocaine. The argument ended when Fontao unbuttoned his jacket and flashed his gun. Vilarchao took the cocaine and told Scaffidi he could continue his efforts to sell it, but stated he wanted no further dealings with DeVarona. DeVarona's active involvement ended at this point.

Vilarchao also met with Scudder on December 16 and told him he would ship the cocaine to New York if Scudder could not sell it in San Antonio. Vilarchao called Scudder on December 17 and told Scudder he was going to Los Angeles.

### D.

When Scudder told Romano that Vilarchao and his cocaine were leaving town, Romano lost his temper. Romano spent the next nine days badgering Scudder and threatening his family until Scudder caved in and agreed to help Romano retrieve the cocaine. The government calls this the conspiracy's third episode; DeVarona calls it the third conspiracy.

Scudder contacted Vilarchao on December 26, 1985 and told him Romano had a ready buyer for the ten kilograms. Vilarchao invited Scudder to come to Miami to discuss the deal; he told Scudder in Miami that he would sell the cocaine to Scudder for $25,000 per kilogram. After returning to San Antonio and conferring with Romano, Scudder called one of Vilarchao's associates on January 2, 1986 to order the cocaine.

Scudder met at a San Antonio hotel with Fontao and another Vilarchao associate on January 6, 1986, where he received about two kilograms of cocaine in a fiberglas container. Scudder tried unsuccessfully during the next few days to find Romano and to sell the cocaine. Eventually Fontao and Vilarchao's other associate gave Scudder three more kilograms and left San Antonio.

Romano disclosed the distribution scheme to the Drug Enforcement Administration on January 13, 1986. Two DEA agents planned an undercover purchase of

cocaine from Scudder. Romano introduced Scudder to the two agents at a restaurant on January 16, 1986.

Before his arrest a few weeks later, Scudder sold four kilograms of cocaine to the DEA agents. At trial the North Miami Police Department officer who had investigated the February 1985 marina theft testified that a fiberglas container of cocaine Scudder had sold to the DEA agents was "very similar" to the ones he saw on the speed boat following the theft in February. Although Scudder, Vilarchao and the agents negotiated over the purchase of fifty-six additional kilograms of cocaine, the parties never consummated that deal before the DEA arrested the defendants and killed the distribution scheme.

## II.

### A.

To establish a conspiracy the government must prove that (1) a common agreement or conspiracy existed; (2) the defendant knew of the conspiracy; and (3) the defendant, with knowledge, voluntarily joined the conspiracy. *United States v. Elam*, 678 F.2d 1234, 1245 (5th Cir.1982). DeVarona argues that the evidence did not conform to the indictment's charge of a single conspiracy. He contends that the evidence established at least two, and possibly three conspiracies: (1) the Miami boat chase and its aftermath, running from January 24 until February 4, 1985; (2) the initial San Antonio sales effort, running from approximately December 10 until December 17, 1985; and (3) the second San Antonio sales effort, covering December 26, 1985 until February 24, 1986.

█ DeVarona concedes that the government proved his participation in the efforts to distribute cocaine in San Antonio from December 10 until December 16, 1985. But he argues that the government's evidence fails to tie him to either of what he calls the other two conspiracies. DeVarona establishes reversible error if he shows: (1) a variance between the indictment and the government's proof at trial; and (2) prejudice from that variance. *United States v.*

*Richerson*, 833 F.2d 1147, 1152 (5th Cir. 1987); *United States v. Winship*, 724 F.2d 1116, 1122 (5th Cir.1984).

█ We must affirm the jury's finding that the government proved a single conspiracy unless the evidence and all reasonable inferences, examined in the light most favorable to the government, would preclude reasonable jurors from finding a single conspiracy beyond a reasonable doubt. *Elam*, 678 F.2d at 1245. The jury may find a single conspiracy if the evidence demonstrates that all of the alleged co-conspirators directed their efforts to accomplish a single goal or common purpose. *Id.* at 1245; *United States v. Perez*, 489 F.2d 51 (5th Cir.1973), cert. denied sub nom. *Hamilton v. United States*, 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974). We conclude that the evidence here entitled the jury to find a single conspiracy.

The Fifth Circuit has examined three factors in determining whether a series of events constitute a single conspiracy: (1) the existence of a common goal; (2) the nature of the scheme; and (3) overlapping of participants in the various dealings. *Richerson*, 833 F.2d at 1153; *United States v. Tilton*, 610 F.2d 302, 307 (5th Cir.1980). This court has discerned a common purpose in a plan to buy cocaine involving various participants over three years, *United States v. Rodriguez*, 509 F.2d 1342, 1348 (5th Cir.1975), and in a series of staged car accidents involving different participants at different locations over an extended time. *United States v. Lloyd*, 425 F.2d 711, 712 (5th Cir.1970). The defendants' central goal in this case— the sale of cocaine for profit—easily falls within the "common purpose" test's broad reach.

In analyzing whether the nature of the scheme points to a single conspiracy, this court has avoided analogies to wheels, rims, hubs and chains. *Richerson*, 833 F.2d at 1153. Instead, we have asked whether "the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme or to the overall success of the venture," *Elam*, 678 F.2d at 1246, and

whether the "agreement contemplated bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators...." *Perez,* 489 F.2d at 62.

The necessity of a steady cocaine supply to feed a distribution effort is beyond question. As Vilarchao explained at the dinner with Scaffidi and DeVarona on December 13, 1985, Vilarchao secured cocaine supplies by smuggling the drug into Miami aboard fast boats. The jury was entitled to infer that the Miami boat chase on January 24, 1985—during which Vilarchao drove a boat belonging to Fontao and held the registration form for the cocaine-laden second boat—represented just such a smuggling effort. Further, the jury was entitled to infer a continuous drug distribution effort by Vilarchao and DeVarona from Vilarchao's comment that the two had been working together for some time.

DeVarona served as the contact man between Vilarchao and Scaffidi, providing the key link between Vilarchao's Miami cocaine supply and distribution network and the San Antonio sales operation. Scaffidi received a kilogram of cocaine from Vilarchao on December 16, 1985 in Vilarchao's white fiberglas container, and noted its similarity to a container retrieved from the scene of the February 1985 marina theft in Miami. DeVarona assisted Scaffidi's efforts to sell that cocaine until his falling out with Vilarchao on December 16, 1985.

A North Miami Police Department Officer also testified about the close resemblence between the white fiberglas containers he observed after the marina theft and the kilograms Scudder sold to the DEA months later in San Antonio. These containers—which experienced drug officers described at trial as unique—further establish the continuity between the Miami boat chase and both phases of the San Antonio sales effort.

Neither the ten-month gap between the boat chase and the first events in San Antonio nor the hiatus from December 17 to 26, 1985 defeats the single conspiracy theory. As the Second Circuit has noted, " '[A] single conspiracy is not transposed into a multiple one simply by lapse of time, change in membership, or a shifting emphasis in the locale of operation.' " *United States v. Vila,* 599 F.2d 21, 24 (2d Cir.), cert. denied, 444 U.S. 837, 100 S.Ct. 73, 62 L.Ed.2d 48 (1979) (quoting *United States v. Armedo–Sarmiento,* 545 F.2d 785, 790 (2d Cir.1976), cert. denied, 430 U.S. 917, 97 S.Ct. 1330, 51 L.Ed.2d 595 (1977)). See also *United States v. Napue,* 834 F.2d 1311, 1333 (7th Cir.1987).

Thus, the Eighth Circuit has held that a nine-month lapse in the arson activities of RICO conspirators did not create separate conspiracies regarding appellants who played no role in fires set before the lapse. *United States v. Lemm,* 680 F.2d 1193, 1202–03 (8th Cir.1982), cert. denied, 459 U.S. 1110, 103 S.Ct. 739, 74 L.Ed.2d 960 (1983). The court reasoned that the arson-for-profit enterprise's continuous existence, the key figure's continuous involvement, and the overlapping methods used established a single RICO conspiracy. *Id.* at 1203–04.

Similarly, the evidence here established Vilarchao's consistent role as the cocaine supplier and leader of the distribution network in all aspects of the conspiracy. Vilarchao's self-described method of importing cocaine in speed boats further links the Miami and San Antonio events together; the watertight and buoyant nature of Vilarchao's unique packaging reinforces that link. These factors point to the conspiracy's continuity of purpose and existence, and justify the jury's finding of a single conspiracy. See also *Napue,* 834 F.2d at 1332–33 (Two and one-half year gap in proof of sale of drugs does not necessarily defeat single conspiracy theory).

Turning to the third factor, the Fifth Circuit has recognized that a single conspiracy can involve one pivotal figure who directs illegal activities while various combinations of other defendants further those activities in different ways and at different times. *Elam,* 678 F.2d at 1246. A single conspiracy finding does not require every member to participate in every transaction. *Perez,* 489 F.2d at 62.

Here, Vilarchao played the kingpin role in a cocaine supply and distribution operation that stretched from Miami to San Antonio. As Vilarchao described it to Scaffidi at dinner, that supply effort included smuggling cocaine to Miami on fast boats—precisely the scenario that unfolded during the Miami boat chase in January 1985. The government was not required to establish that DeVarona participated in the boat chase episode; it was sufficient for the government to establish that DeVarona labored in Vilarchao's distribution operation by bringing Scaffidi and Vilarchao together in San Antonio. Moreover, DeVarona furthered the conspiracy's distribution efforts when he tried to help Scaffidi sell the cocaine that Vilarchao instructed Fontao to deliver to San Antonio from Miami.

DeVarona's impact on the San Antonio sales effort continued after he and Vilarchao argued and DeVarona's active involvement ended; when Scudder and Romano decided to revive the scheme after Christmas they contacted Vilarchao, the man DeVarona had matched them with earlier that month. As the Second Circuit has noted, disputes between participants do not necessarily defeat a single conspiracy theory. See *United States v. Heinemann,* 801 F.2d 86, 92 (2d Cir.1986), cert. denied, 479 U.S. 1094, 107 S.Ct. 1308, 94 L.Ed.2d 163 (1987).

With the exception of DeVarona, Scaffidi, Cantu and one other person, the players involved in the San Antonio sales effort's two phases remained the same. Moreover, Scaffidi's testimony also supports an inference that some of the same individuals were engaged in both the Miami and San Antonio events. Scaffidi testified that he talked with Vilarchao, Jose Fontao and a third Vilarchao associate involved in the San Antonio scheme, Alfredo Perez, while in jail after his arrest. During that conversation Vilarchao described the January 1985 Miami boat chase and indicated that "they" and "other persons" broke into the second boat at the Miami marina to steal the hidden cocaine. Scaffidi testified that Fontao admitted "it had happened" after Vilarchao described the chase and theft.

Given the overlapping goals, methods and personnel involved in the events in Miami and San Antonio, the jury was entitled to find that the proof established a single drug conspiracy running from January 24, 1985 until February 24, 1986.

### B.

DeVarona also relies on Fed.R.Crim.P. 8(b) and 14 to argue that the government improperly joined his conspiracy count with the substantive possession charge against Vilarchao and Fontao in Count Two. Rule 8(b) permits joinder of defendants in the same indictment if the government alleges that they participated "in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses."

DeVarona concedes that the charges here appear to be properly joined. See *United States v. Kaufman,* 858 F.2d 994, 1003 (5th Cir.1988). But he argues that the government's superseding indictment demonstrates bad faith because it expands the conspiracy's time frame to include the Miami boat chase. DeVarona reasons that this bad faith invalidates Rule 8(b) joinder because the government used the expansion to introduce otherwise inadmissible evidence about the boat chase.

■ We reject this argument because nothing in the record points to bad faith. The indictment alleged a single overarching conspiracy; the government's proof focused on Vilarchao as the conspiracy's kingpin and DeVarona's participation in San Antonio. DeVarona's absence from a particular episode in the conspiracy does not mandate severance. See *United States v. Fortna,* 796 F.2d 724, 737–38 (5th Cir.), cert. denied, 479 U.S. 950, 107 S.Ct. 437, 93 L.Ed.2d 386 (1986); Fed.R.Crim.P. 8(b).

■ Rule 14 gives the district court discretion to sever properly joined defendants to prevent prejudice. We review the district court's decision denying severance under Rule 14 for abuse of discretion. *United States v. Stotts,* 792 F.2d 1318, 1321 (5th Cir.1986). To demonstrate an abuse of discretion DeVarona must show that: (1) the

joint trial prejudiced him to such an extent that the district court could not provide adequate protection; and (2) the prejudice outweighed the government's interest in economy of judicial administration. *United States v. Basey*, 816 F.2d 980, 1004 (5th Cir.1987). We discern no prejudice to De-Varona from this joinder and thus no abuse of discretion.

The government did not present evidence of such complexity that it created a significant threat of guilt transference. And contrary to DeVarona's claims on appeal, the evidence against him established more than "minimal" participation. Further, the district court's charge instructed the jury to consider each defendant and each count separately, thus minimizing any threat to DeVarona. See *United States v. Hughes*, 817 F.2d 268, 272–73 (5th Cir.), cert. denied, —— U.S. ——, 108 S.Ct. 170, 98 L.Ed.2d 124 (1987).

Because we find no error, the conviction is

AFFIRMED.