**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Julio MACEO, Hiram Lee Bauman,**
**John Cary and Pedro Talamas,**
**Defendants–Appellants.**

**No. 90–2507.**

United States Court of Appeals,
Fifth Circuit.

Oct. 16, 1991.

1192

John G. Garcia, Houston, Tex. (Court-appointed), for Maceo.

George McCall Secrest, Jr., Houston, Tex. (Court-appointed), for Bauman.

Ward Casey, Jeff Kearney, Ft. Worth, Tex., for Cary.

Frank A. Rubino, Coconut Grove, Fla., for Talamas.

Sean Connelly, U.S. Dept. of Justice, Washington, D.C., Paula C. Offenhauser, Asst. U.S. Atty., Ronald G. Woods, U.S. Atty., Houston, Tex., for U.S.

Before WISDOM, JOLLY, and SMITH, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

The jury convicted Pedro Talamas, Hiram Lee Bauman, and John Cary of two cocaine importation charges, conspiracy to import cocaine and conspiracy to possess cocaine with the intent to distribute it. Julio Maceo was convicted of conspiracy to possess cocaine with the intent to distribute it. The appellants argue that: (1) there is insufficient evidence to establish one single conspiracy; (2) there is insufficient evidence to support their convictions; (3) the jury should not have been given a deliberate ignorance instruction; and (4) the trial

judge improperly admitted into evidence Bauman's personal use of cocaine and his receipt of cocaine as legal fees, and Cary's distribution of cocaine to Las Vegas casino operators. We find no error and affirm.[1]

## I

At trial, the principal witnesses were co-defendants who testified as government witnesses. These witnesses testified to the following course of events. In 1981, Idanael Martinez and Pedro Talamas met in Bogota, Columbia, to discuss the possibility of importing cocaine into the United States. Sometime later, Martinez secured a kilogram of cocaine and travelled to Miami, where he sold it to Talamas. About a month later, Martinez and Talamas arranged a second deal. Talamas's couriers met Martinez in Costa Rica, received two kilos of cocaine from him and delivered it to Talamas in Miami, who then sold it to Winston Vidiella–Lopez.

In January 1982, after assuring Martinez that he could distribute any cocaine Martinez could deliver, Talamas introduced Martinez to Vidiella–Lopez and other drug traffickers. Martinez told Talamas and Vidiella–Lopez that he could import larger quantities of cocaine and that he was "counting on their business going well."

Martinez later met Pedro Ortegon, a major Columbian supplier. In July 1982, Martinez set up residence in Miami. One month later, Martinez received 45 kilos of cocaine sent by Ortegon. Martinez sold two kilograms to Talamas and sold the rest to Vidiella–Lopez and others. Between August 1982 and May 1983, Ortegon shipped hundreds of kilos of cocaine to Martinez. Martinez resold approximately twenty-one kilos to Talamas and far greater amounts to Vidiella–Lopez.

There was testimony that Martinez and Vidiella–Lopez were acting as partners. In October 1982, Vidiella–Lopez arranged for the safekeeping of over 100 kilograms of cocaine that Martinez had been storing in his home. They discussed setting up their own transportation network to import drugs directly from Columbia.

In pursuit of that idea, Martinez and other co-conspirators bought three airplanes from John Cary. In December 1982, John Cary sold Martinez and Robert Watkins a Baron 58 airplane in exchange for two kilograms of cocaine. In early 1983, Cary sold Martinez a Piper Navajo with extra fuel tank capacity, in return for six kilograms of cocaine. Martinez arranged for payment by calling Vidiella–Lopez, who sent Julio Maceo to New Orleans with the cocaine for Cary. After the second plane was seized by custom officials, Martinez arranged to buy another Piper Navajo from Cary. This time, however, Cary did not accept merchandise as payment, but instead received 10,000 ounces of silver, because the owner of the plane needed money. This third plane was the one used in Martinez's first successful importation into the Savannah area. Martinez intended to purchase a larger plane and began paying installments of cocaine to Cary. Martinez had Edward Tejeiros drive from Florida to Fort Worth to deliver a van and cocaine to Cary. Later that summer, Mario Ginoris made a similar trip. All total, Martinez sent Cary twenty-three kilos of cocaine in anticipation of purchasing a fourth plane.

Hiram Lee Bauman, a Florida attorney, performed a number of services in connection with Martinez's and Vidiella–Lopez's drug dealings. Vidiella–Lopez testified that Bauman was his "trust lawyer," providing him advice about the illegal things he did and how to avoid detection. After the second plane Martinez had bought from Cary was seized by the government, Bauman unsuccessfully attempted to get it back for Martinez. Bauman claimed the plane was owned by I.C.E., Inc., an aviation

---

1. This case originally was scheduled for oral argument as to all four defendants, each represented by his own attorney. Because of an unexpected scheduling conflict, Talamas's attorney requested a continuance of oral argument as to Talamas. We excused counsel from argument and heard argument from the government and defense attorneys as to the appeals of Maceo, Bauman, and Cary only. We now have determined that oral argument on behalf of Talamas is unnecessary and would provide no benefit to the court in resolving this case.

company that had purchased the plane in January 1983. Martinez testified, however, that this corporation was not formed by Bauman until after the plane was seized. Martinez also paid Bauman to secure the release of a different plane owned by David Ledford. Bauman was successful and the plane was used by Martinez in February 1984 to import a large shipment of cocaine into Louisiana.

Bauman assisted Martinez and Vidiella–Lopez in purchasing the third airplane from Cary in return for the silver. Vidiella–Lopez told Bauman he wanted to have the plane registered in a phony name in case there was trouble later. Bauman also convinced Martinez to bail Watkins out of jail because otherwise Watkins might talk to the police about Martinez and Vidiella–Lopez. Bauman changed smaller currency into larger currency for Martinez and Vidiella–Lopez so that it could be shipped back to suppliers more easily and so that Martinez and Vidiella–Lopez would not be identified on transaction reports. Bauman represented Mario Ginoris, one of Vidiella–Lopez's drug operatives, on two separate occasions and received cocaine as legal fees. Bauman also restored Mario Ginoris's driver's license, enabling him to drive imported cocaine from Georgia to Miami.

After Vidiella–Lopez's arrest in 1984, Bauman helped him secure his release on bond and then remained in contact with him while he was a fugitive. Bauman assisted Martinez in purchasing a house for $270,000 cash. The house was to be purchased in a corporation's name in order to hide the true identity of the owner, but because the corporation was not qualified to do business in Florida, Bauman purchased the house as trustee for the unidentified corporation.

Martinez continued to import drugs into the United States. In spring 1983, Martinez imported 374 kilos of cocaine from Columbia to the Savannah, Georgia area. Paul Cotton, the pilot, used the third plane sold by Cary. Vidiella–Lopez's men transported the cocaine from Georgia to Miami, where it was stored in Maceo's rental home. Maceo called Martinez to let him know the importation was successful. Vidiella–Lopez, his men, and Bauman had a celebration party in Vidiella–Lopez's Miami home. From Miami, Martinez distributed the cocaine to persons designated by Ortegon and to his own customers, including Talamas.

After Vidiella–Lopez and Paul Cotton were arrested, Talamas introduced a new pilot, David Ledford, to Martinez. In February 1984, Martinez employed Ledford to run a large shipment of cocaine into the United States, this time through Louisiana. Martinez experienced a shortfall when making his deliveries and Talamas helped Martinez out by selling him two kilograms of cocaine.

The third direct importation occurred in August 1984. Ledford picked up the cocaine in Columbia and transported it to a place near Galveston, Texas, where it was loaded onto a van. By then, Ledford was cooperating with the federal authorities; one of the offloading men was a DEA agent. The drugs were seized and Martinez sent a newspaper article about the incident to Ortegon to prove the drugs had been seized.

In October 1984, Martinez attempted the fourth direct importation. Ledford picked up the cocaine in Columbia from Ortegon and flew it back to Houston, Texas. Martinez planned to travel from Houston to Miami once the drugs were delivered in order to arrange for distribution. Martinez was arrested at the Intercontinental Airport in Houston.

II

On April 15, 1987, the defendants were indicted by a federal grand jury. On September 2, 1987, a superseding indictment was filed charging Bauman, Cary and Talamas in four counts and charging Maceo in one count. After a jury trial in the United States District Court for the Southern District of Texas, the defendants were convicted of all counts charged in the indictment. Defendants Bauman, Cary, and Talamas were convicted of conspiracy to import cocaine into the United States under 21 U.S.C. § 963, conspiracy to possess cocaine

with intent to distribute it under 21 U.S.C. §§ 841 and 846, and two substantive counts of cocaine importation under 21 U.S.C. § 952 and § 960, one importation into Galveston, Texas and one into Houston, Texas. Defendant Maceo was convicted of conspiracy to possess cocaine with intent to distribute it under 21 U.S.C. § 846.

Bauman received a fifteen year prison sentence, while Talamas, Cary and Maceo were sentenced to twelve year prison terms. The prison terms of Talamas, Cary and Bauman are to be followed by three year special parole terms, and Talamas was additionally sentenced to a five-year term of supervised probation requiring payment of a $10,000 fine.

Maceo, Talamas, Bauman and Cary all filed motions for judgment of acquittal, which were denied. The defendants have timely appealed their convictions.

## III

The four appellants raise numerous points on appeal, the majority of which clearly lack merit. Bauman argues that: (1) the evidence is insufficient to support his conviction on four counts; (2) the district court reversibly erred by providing the jury with a deliberate ignorance instruction; (3) the district court impermissibly admitted into evidence testimony about extrinsic offenses; and (4) the district court violated his right to due process during his sentencing because it relied upon incorrect assumptions. Cary argues that: (1) there is insufficient evidence to support his conviction; (2) there was an impermissible constructive amendment of the indictment because evidence was introduced regarding his distribution of cocaine to Las Vegas casino operators; (3) the judge impermissibly testified as a witness and limited the scope of cross examination; and (4) the trial court incorrectly gave the jury a deliberate ignorance instruction. Maceo argues: (1) that there is insufficient evidence to support his conviction; and (2) that there were multiple conspiracies rather than one large conspiracy and that he was not a member of the conspiracy which imported cocaine into Texas. Talamas argues that

there is insufficient evidence to support his conviction because the evidence establishes two conspiracies and that he was not involved in the conspiracy to import and distribute cocaine into Georgia and Texas.

## IV

### A

Maceo and Talamas both contend that the evidence establishes more than one conspiracy, that they were not participants in the later conspiracy to import cocaine into Texas, and therefore, that they were convicted of a conspiracy in which they did not participate. We must affirm the jury's verdict unless the evidence, examined in the light most favorable to the government, would preclude reasonable jurors from finding that one overall conspiracy existed beyond a reasonable doubt. *United States v. DeVarona*, 872 F.2d 114, 118 (5th Cir.1989). "The jury may find a single conspiracy if the evidence demonstrates that all of the alleged co-conspirators directed their efforts to accomplish a single goal or common purpose." *Id.* In determining whether a single conspiracy existed, this Court has examined three factors: (1) the existence of a common goal; (2) the nature of the scheme; and (3) the overlap of the participants. *Id.* This court has previously held that a common purpose existed in a plan involving various participants to buy cocaine over a three year period. *Id.* (referring to *United States v. Rodriguez*, 509 F.2d 1342, 1348 (5th Cir. 1975)).

The defendants' common purpose of importing cocaine into the United States for distribution easily satisfies the first criteria. During the entire period in which these defendants were involved in the drug trafficking with Martinez, the central goal for all of them was to further the importation and distribution of cocaine. The fact that the location of importation and some of the participants changed does not affect our conclusion that the defendants and other co-conspirators had a common purpose.

In determining whether the nature of the scheme suggests a single conspiracy, this

court has avoided making analogies to wheels or chains. *Id.; United States v. Richerson*, 833 F.2d 1147, 1153 (5th Cir. 1987); *United States v. Elam*, 678 F.2d 1234, 1246 (5th Cir.1982). Instead, we have focused on whether "the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme or to the overall success of the venture." *DeVarona*, 872 F.2d at 118 (quoting *Elam*, 678 F.2d at 1246). "The necessity of a steady cocaine supply to feed a distribution effort is beyond question." *DeVarona*, 872 F.2d at 119. It is clear that the importation of cocaine into Texas was dependent on distribution. The similar pattern of all the importations points to one large conspiracy over time, not an earlier conspiracy followed independently by a later one. The cocaine was flown in by Martinez's pilot to a location in the South, where it was to be transported to Miami for distribution by Martinez. This pattern justifies a finding of a single conspiracy.

■ With respect to the third factor, this Court "has recognized that a single conspiracy can involve one pivotal figure who directs illegal activities while various combinations of other defendants further those activities in different ways and at different times." *Id.* at 119 (referring to *Elam*, 678 F.2d at 1246). "A single conspiracy does not require every member to participate in every transaction." *Id.* (referring to *United States v. Perez*, 489 F.2d 51, 62 (5th Cir.1973), cert. denied sub nom. *Hamilton v. United States*, 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974)). Here, Martinez and Vidiella–Lopez played the central roles in the importation and distribution operation. Even though Vidiella–Lopez was arrested before the importations into Texas, the other players involved remained substantially the same. The fact that the participants in the various dealings overlapped to a substantial degree supports the conclusion that there was one single conspiracy. Based upon our review of these three factors, we find that there was sufficient evidence to support the jury's finding of a single conspiracy.

**B**

■ All four of the appellants contend that there is insufficient evidence to support their individual convictions. In considering the sufficiency of the evidence, we must view the evidence in the light most favorable to the government and decide whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *DeVarona*, 872 F.2d at 118. In order to prove a conspiracy to import cocaine and a conspiracy to possess cocaine with intent to distribute it, the government must prove: (1) a conspiracy existed; (2) the defendant knew of the conspiracy; and (3) the defendant voluntarily participated in it. *United States v. Rodriguez*, 926 F.2d 418, 422 (5th Cir.1991); *DeVarona*, 872 F.2d at 118.

■ As discussed above, there was sufficient evidence introduced at trial from which a rational jury could have concluded that there was one large overarching conspiracy to import cocaine and to possess cocaine with the intent to distribute it. There is also sufficient evidence to support the conclusion that each of the four appellants knew of the conspiracy to import cocaine and to possess cocaine with the intent to distribute it, and that they each voluntarily participated in it. Talamas was crucial to the early stages of the conspiracy. He was involved in the first smaller importations, he introduced Martinez to Vidiella–Lopez and he remained a customer of Martinez's. Later, he introduced David Ledford, the pilot who flew both runs into Texas, to Martinez and he also sold Martinez cocaine when he was short. Cary also voluntarily participated in what he knew was a conspiracy. He sold Martinez three planes, two of them in exchange for cocaine. He was also receiving cocaine as installment payments on a fourth airplane. Bauman also knew there was a conspiracy and furthered it by representing Vidiella–Lopez and Martinez in various "legal" matters. He laundered money for them, tried to recover seized planes through illegal means, bought a house for cash in his name to hide their ownership and helped

them purchase the third airplane from Cary. There was plenty of evidence that Maceo was also a confederate in the conspiracy. He delivered cocaine, stored it in his home and was Martinez's source of information regarding the success of the importations. The record shows that he was associated with Martinez's drug trafficking scheme until Martinez was arrested. Therefore, we find that there is sufficient evidence from which a jury could find that one single · conspiracy existed, that each of the defendants knew about it and that each voluntarily participated in it.

■ The underlying convictions of importation of cocaine were based on *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). *Pinkerton* holds that a conspirator can be held liable for the substantive acts of a co-conspirator as long as the acts were reasonably foreseeable and done in furtherance of the conspiracy. *Id.* at 647–48, 66 S.Ct. at 1184–85; *United States v. Devine*, 934 F.2d 1325, 1332 (5th Cir.1991). The importation of cocaine into the United States for distribution was the very essence of, and thus a reasonably foreseeable part of, appellants' conspiracy. Based on a *Pinkerton* theory of liability, there is clearly sufficient evidence from which a reasonable jury could find that Talamas, Cary and Bauman were guilty of importation of cocaine on two separate occasions. Therefore, we find that there is sufficient evidence to support the convictions of all appellants on all counts.

## V

### A

■ Bauman and Cary contend that the district court reversibly erred by providing the jury with a deliberate ignorance instruction. They both claim that the delib-

erate ignorance instruction should not have been given at all. Neither made a specific objection to the deliberate ignorance instruction at trial. Bauman objected to the wording of the deliberate ignorance instruction, but did not suggest that it should not have been given in any form. Cary made no objection. Because the defendants did not specifically object at trial to the instruction, they must show it was plain error. Fed.R.Crim.P. 30, 52(b); *United States v. Ortega*, 859 F.2d 327, 330 (5th Cir.1988), *cert. denied*, 489 U.S. 1027, 109 S.Ct. 1157, 103 L.Ed.2d 216 (1989). The plain error doctrine only permits us to correct egregious errors which result in a miscarriage of justice. *Id.* After reviewing the jury instructions in their entirety, we find that the deliberate ignorance instruction was not a plain error. The claim that it was not properly given also lacks merit.

### B

Both Cary and Bauman argue that the trial court improperly admitted extrinsic evidence. Bauman claims that the trial court repeatedly allowed testimony about Bauman's personal use of cocaine and his receipt of cocaine as legal fees. Bauman objected to the testimony at trial, but the district court allowed it, arguing that the testimony showed Bauman knew Martinez and others were dealing cocaine. Bauman's counsel requested the court to consider whether the probative value of the testimony outweighed the prejudicial effect. The court did not explicitly perform a balancing test on the record.

■ Bauman argues that the evidence was admitted in violation of Rules 403 and 404(b) of the Federal Rules of Evidence.[2] Rule 404(b) only applies to evidence of extrinsic offenses. *United States*

---

2. Rule 403 provides:
   Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.
   Rule 404(b) provides:

   Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

*v. Simpson*, 709 F.2d 903, 907 (5th Cir. 1983), cert. denied, 464 U.S. 942, 104 S.Ct. 360, 78 L.Ed.2d 322. Evidence of an uncharged offense arising out of the same transactions as the offenses charged in the indictment is not extrinsic evidence within the meaning of Rule 404(b), and is therefore not barred by the rule. *Id.* Evidence of Bauman's personal use of cocaine and his receipt of cocaine as legal fees was not extrinsic evidence; it was "inextricably intertwined with the evidence used to prove the crime charged, [and] is admissible so that the jury may evaluate all of the circumstances under which the defendant acted." *United States v. Randall*, 887 F.2d 1262, 1268 (5th Cir.1989). The evidence that Bauman personally used cocaine with others involved in this drug trafficking ring and that he received cocaine as legal fees is clearly intertwined with the evidence necessary to prove he knew about the drug trafficking conspiracy and knowingly participated in it. Therefore, we find that the trial judge did not violate Rule 404(b) by admitting into evidence testimony about Bauman's personal use of cocaine or his receipt of cocaine as legal fees.[3]

■ We also find that the admission of the testimony did not violate Rule 403, which allows a trial judge to exclude probative evidence that is substantially outweighed by its prejudicial effect. "[The] balancing of probative value against prejudicial effect is committed to the sound discretion of the trial judge, a decision that is final in the absence of abuse of discretion." *United States v. Thompson*, 837 F.2d 673, 677 (5th Cir.1988), *cert. denied*, 488 U.S. 832, 109 S.Ct. 89, 102 L.Ed.2d 65. Even though the trial judge did not make explicit on-the-record findings regarding the probative value and prejudicial effect of the testimony, he did consider Bauman's arguments and limited testimony to Bauman's cocaine use with co-conspirators during the time of the conspiracy.[4] The judge also gave an instruction at the end of trial admonishing the jury to consider evidence of transactions similar to those charged only for the purpose of determining the defendant's intent. We find that the trial judge did consider Bauman's counsel's request, and that he did not abuse his discretion in admitting the testimony because its prejudicial effect did not substantially outweigh its probative value.

■ Cary argues that the district court improperly admitted into evidence testimony about his distribution of cocaine to Las Vegas casino operators and that the jury convicted him of that crime, instead of the crime for which he was indicted. Cary's argument must fail for the same reason Bauman's did. Paul Cotton testified that when he and Cary were in Las Vegas they received royal treatment because the casino operators liked Cary's cocaine. The testimony admitted was not evidence of an extrinsic offense, but was inextricably intertwined with the crime with which Cary

---

3. Bauman contends that the district court violated the two step test established by this Court in *United States v. Beechum*, 582 F.2d 898 (5th Cir.1978), cert. denied, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979). *Beechum* holds that extrinsic evidence is admissible under 404(b) if it is relevant to an issue other than the defendant's character, and if its probative value outweighs its prejudicial effect under Rule 403. *Id.* at 911. Under the *Beechum* analysis, on-the-record findings by the trial judge as to probative value/prejudicial effect are required when balancing is requested by a party. *United States v. Zabaneh*, 837 F.2d 1249, 1262 (5th Cir.1988); *United States v. Robinson*, 700 F.2d 205, 213 (5th Cir.1983), cert. denied, 465 U.S. 1008, 104 S.Ct. 1003, 79 L.Ed.2d 235 (1984). Bauman argues that the evidence. was more prejudicial than probative, and that the trial judge did not conduct an on-the-record bal-

ancing test as mandated by *Robinson*. However, because we find the evidence is not extrinsic, *Beechum* and *Robinson* do not apply.

4. This court has only required a trial judge to make on-the-record findings when counsel requests in the context of a *Beechum* analysis involving extrinsic evidence. Since the evidence here is not extrinsic, *Beechum* does not apply. But even under *Beechum*, the absence of on-the-record findings, when balancing was requested, does not mandate a remand. "In the absence of on-the-record findings in response to such a request, we will be obliged to remand unless the factors upon which the probative value/prejudice evaluation were made are readily apparent from the record, and there is no substantial uncertainty about the correctness of the ruling." *United States v. Robinson*, 700 F.2d 205, 213 (5th Cir.1983).

was charged. The trial judge overruled Cary's attorney's objection to the testimony, stating that a jury could infer a number of things from it related to the conspiracy, including the inference that Cary received cocaine as payment for the plane. Therefore, agreeing that the evidence was not extrinsic, we hold that it was properly admitted. *Randall,* 887 F.2d at 1268. There was sufficient evidence to support Cary's conviction on the charges for which he was indicted, and the judge instructed the jury to consider testimony about transactions similar to those charged in the indictment only for the purpose of determining the defendant's intent.[5]

### C

■ Bauman contends that his right to due process was violated by the district court's sentencing because the district court relied upon incorrect or unsupported assumptions. At sentencing, the district court relied upon Bauman's acts of bailing Watkins out of jail and obtaining the airplane seized by law enforcement officials as grounds establishing his significant involvement and culpability. The district court stated that Bauman knew Watkins had been involved in drug trafficking and that he knew the plane had been used to transport drugs. Furthermore, it was clear that Bauman had abandoned any professional role and was personally involved in the illegal conspiracy. Thus, these assumptions are certainly supported by the record, and therefore did not violate Bauman's right to due process.

### D

■ Cary argues that the trial judge impermissibly testified as a witness and limited the scope of cross-examination. When Martinez was on the witness stand, Cary's trial attorney questioned him about the terms of his plea bargain in an attempt to show that the witness had a greater incentive to lie. The court intervened and objected that counsel had misstated the law

of plea bargains. Cary claims that in doing so, the judge violated Fed.R.Evid. 605, which bars a judge from testifying as a witness. The judge did not impermissibly testify as to any fact issue when he told Cary's attorney he was misstating the law. Rule 605 does not apply here.

■ Cary also argues that the judge violated his Sixth Amendment confrontation rights by limiting his right to cross-examine Martinez about his plea agreement in order to show his bias. The Confrontation Clause does not prohibit a trial judge from limiting cross-examination where the testimony would confuse the issues, is repetitive or only marginally relevant. *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986). In order to prove that the judge violated the Confrontation Clause, Cary has to show that "[a] reasonable jury might have received a significantly different impression of [Martinez's] credibility had [Cary's] counsel been permitted to pursue his proposed line of cross-examination." *Id.* at 680, 106 S.Ct. at 1436. Here, the jury would not have received a significantly different impression of Martinez's credibility if Cary's lawyer were allowed to continue questioning Martinez about his plea bargain because the jury was well aware of the terms of Martinez's plea. Cary also argues that the judge accused his counsel of intentionally misstating the law, and therefore violated his right to effective assistance of counsel, his right to a trial by an impartial jury and his right to a fair trial. These overstated arguments also plainly lack merit.

### E

■ Maceo argues that the district court in the Southern District of Texas did not have proper venue because Maceo never went there. This argument necessarily fails since we hold that there is sufficient evidence to support the jury's finding that there was one conspiracy. "Venue is proper in conspiracy offenses in any district

---

**5.** The trial judge specifically instructed the jury to consider evidence of other possessions only to determine the defendant's intent. Cary argues that he should have also mentioned distribution. At best, the district court's failure to more fully instruct the jury is harmless error.

where the agreement was formed or an overt act occurred." *United States v. Winship*, 724 F.2d 1116, 1125 (5th Cir. 1984). Therefore, the district court clearly had proper venue over the conspiracy charges because there was clearly an overt act committed there; i.e., the importation of cocaine. Crimes based on a *Pinkerton* theory may be tried where the co-conspirator committed the crime. *United States v. Parrish*, 736 F.2d 152, 158 (5th Cir.1984) Therefore, the district court had proper venue over the cocaine importation charges as well.

## VI

In summary, we find no basis for reversal of the district court. There was sufficient evidence to support the jury's finding that one conspiracy existed and to support each of the convictions. Neither the deliberate ignorance instruction nor the admission of evidence of Bauman's personal use of cocaine and of Cary's distribution of cocaine was reversible error. Defendants' remaining claims lack even colorable merit. The trial court was correct in denying the defendants' motions for judgment of acquittal. Therefore, the decision of the district court is

AFFIRMED.