UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

--------------------------

No. 92-8296

--------------------------

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

HAROLD C. RIDLEHUBER, JR.,

Defendant-Appellant.

--------------------------

Appeal from the United States District Court for the
Western District of Texas
--------------------------

December 29, 1993

Before EMILIO M. GARZA and DeMOSS, Circuit Judges, and ZAGEL,[1]
District Judge.

Zagel, District Judge:

Harold Ridlehuber, Jr., convicted of possessing an
unregistered short-barreled shotgun, was sentenced to thirty months
in prison, a three-year term of supervised release and a $3000
fine. He appeals from that conviction.

--------------------------

[1] District Judge of the Northern District of Illinois,
sitting by designation.

## I.  FACTS

Much of the physical evidence in this case was seized in September 1991 when law enforcement officers executed several search warrants in Hillsboro, Texas.  During the search of a house leased by Harold Ridlehuber, Sr., for the use of his son, the defendant, officers found a short-barreled Stevens Savage 20-guage shotgun resting on an open shelf in the kitchen.[2]  Next to the shotgun, the officers found an ammunition clip for a Colt AR-15 rifle.  In another part of the house the officers found a Mossberg 20-guage shotgun of legal length standing upright against a wall quite near a door, two more AR-15 clips and a box of 20-guage shells.  A few 20-guage casings were found on the driveway.  In addition to the weapons, the officers found the following: a drum containing 230 pounds of sulfuric acid, two gallons of ether, a can of ether starting fluid, a pan containing aluminum shavings, a hot plate, tubing, a Pyrex funnel, thermometers, and rubber stoppers.

Search warrants were also executed at Ridlehuber, Sr.'s home and at his place of business, a Hillsboro metal plating shop where defendant worked with his father.  In Ridlehuber, Sr.'s house was a Colt AR-15 rifle and magazines, which Ridlehuber, Sr. said belonged to his son.  At the business office, agents seized numerous chemicals including phenylacetonitrile, ethyl acetate, sodium hydroxide, monomethylamine, ether, muriatic acid, acetone, and reagent alcohol.  In defendant's truck, parked at his father's

---

2  For clarity, the Court will refer to the appellant, Harold Ridlehuber, Jr., as "defendant" or "Ridlehuber," and his father, Harold Ridlehuber, Sr., as "Ridlehuber Sr."

office, was a loaded .45 caliber pistol. Except for the monomethylamine, all of the chemicals were later returned to Ridlehuber Sr., who used the chemicals in his metal plating business.

Facts like these are hard to dispute and defendant did not bother to do so. At trial, the parties presented their respective versions of what these facts mean. The central issue on appeal concerns how the government went about convincing the jury that its interpretation of the facts is the right one.

The evidence presented by the government at trial had a dual focus: drugs and guns. The evidence relating to drugs provided a motive for defendant's possession of the shotgun, while the gun formed the basis for the weapons charge. Motive is not an element of the crime for which defendant was convicted. But the government can prove motive even when it does not have to and here it wanted to provide an explanation for why the gun was in the house. Indeed, proof of defendant's motive for possessing the gun took center stage at trial; the gun itself, like a corpse that opens a detective story, served more as a prop around which the government's theory of the case revolved.

In the government's case-in-chief, several government witnesses, law enforcement personnel experienced in the investigation of drug labs, said that the chemicals and other materials found in defendant's residence and place of employment could be used to manufacture illegal drugs, namely, methamphetamine or amphetamine. This fact was not mentioned in passing. Rather,

3

several witnesses highlighted the possible connection between the evidence seized and the manufacture of drugs. And the government wasted no time presenting this possible connection to the jury. The government's first witness was Robert Wilkerson, a narcotics investigator with the Texas Department of Public Safety, who participated in the investigation leading to Ridlehuber's arrest. The first subject of Wilkerson's testimony was his experience dealing with "individuals engaged in the manufacture of methamphetamine and amphetamine," illegal drugs "generally manufactured by individuals privately." He then identified the defendant and testified about the search warrants that were executed on September 9, 1991 at defendant's residence and place of employment.

Wilkerson was shown about thirteen photographs taken at J & R Coating, Ridlehuber, Sr.'s metal plating shop. Most of the photographs were of various chemicals used in the business that were stored at the shop. Wilkerson testified that although the chemicals shown in the photographs have legitimate uses, some of the chemicals are frequently found in illicit methamphetamine and amphetamine labs. Wilkerson also testified briefly about weapons and ammunition found during the search. Specifically, a pistol and ammunition clip were found on the floorboard of defendant's truck, a Colt AR-15 rifle and ammunition were discovered at his father's home.

4

Two narcotics investigators testified about the execution of the search warrant at defendant's residence. Both testified that the residence had a distinct chemical odor that they have come to associate with clandestine drug labs that produce methamphetamine and amphetamine. One investigator, Coy West, testified about the chemicals and other items, such as aluminum shavings, a hot plate, plastic tubing and thermometers, that were found in defendant's residence. He said he had seen the same kinds of chemicals and other items in clandestine drug labs.[3]

A Bureau of Alcohol, Tobacco and Firearms agent named Ruben Chavez testified about the short-barreled shotgun found on defendant's kitchen shelf. Chavez explained that a short-barreled or sawed-off shotgun is a gun that was at one time legal, but has been modified such that the barrel length is less than 18 inches or the overall length is less than 26 inches. The shotgun found in defendant's residence had a barrel length of 15 and 3/4 inches and an overall length of approximately 25 and 1/2 inches. According to Chavez, although the hammer was broken off, the gun could be cocked and fired if the hammer were pulled back with a tool, such as a pen or screwdriver. Furthermore, Chavez testified that sawed-off

_____

[3] At a sidebar during West's direct testimony, defense counsel objected on relevance grounds to the government's focus on drugs: "my client is not on trial for drugs, he's on trial for possession of a weapon." The court overruled the objection. At the end of West's direct testimony, the court instructed the jury that any evidence "concerning suggestions about a drug laboratory is admitted only for the limited purpose of your consideration, if you wish to consider it, as [sic] any motive that Mr. Ridlehuber might have had in possessing the firearm in question. He's not on trial for operating any drug lab."

5

shotguns are commonly found in drug labs for three reasons. Their reduced size makes them easier to conceal, easier to wield in a gunfight, and the short barrel creates an extreme spread pattern that can knock down multiple adversaries. Chavez did not specify that the shotgun at issue here would fulfill all these purposes.

The testimony of one of the government's witnesses, Deborah Reagan, a chemist with the Texas Department of Public Safety, was focused exclusively on the prosecution's drug lab theory. After attesting to her extensive experience analyzing evidence seized from clandestine drug labs, Reagan testified in detail about the various chemicals seized in connection with this case and their potential usefulness in the production of methamphetamine or amphetamine.[4] She testified that the chemicals found at defendant's residence and place of employment were precursor chemicals necessary in the production of methamphetamine and amphetamine. Reagan stated that although the chemicals found were necessary to make methamphetamine and amphetamine, two precursor chemicals were not found.

Of the seven witnesses that the government called in its case-in-chief, five gave testimony in support of the government's theory that defendant possessed the shotgun to protect a clandestine drug

---

[4] During Reagan's testimony, defense counsel interposed another relevancy objection similar to the one advanced during West's testimony. The court overruled the objection and instructed the jury that "this evidence is offered only for your consideration as to any possible motive, not for any other purposes."

lab.[5] The government continued its efforts to buttress this theory during the cross examination of Ridlehuber, Sr. Most of the inquiries on cross concerned the chemicals used in the metal plating business--Ridlehuber Sr.'s methods for storing the chemicals, his recordkeeping practices with regard to the chemicals, and the potential for the illegal use of the chemicals to manufacture drugs. And in his closing argument, the prosecutor articulated what had been intimated all along: Ridlehuber possessed the sawed-off shotgun to protect an illegal drug lab.

The strongest evidence linking defendant to the sawed-off shotgun is that it was found on an open shelf in the kitchen of the house that defendant's father leased for his son's use.[6] Defendant maintains that the shotgun is not his but, rather, is the property of William Starrett, a man who lived with defendant in the leased house for about a month during July and August of 1991. Starrett was no longer living with defendant when the search warrants were executed in September 1991, but his belongings were found in one of the bedrooms of the leased house when it was searched.

Although there is evidence that defendant was in relatively close proximity to the short-barreled shotgun, there is no evidence that defendant ever handled or closely examined the gun. In addition to the gun being on an open shelf, defendant also had an

_____

[5] The testimony of the other two witness was brief, spanning a combined total of nine pages of the trial transcript.

[6] Defendant actually maintained two residences, living part-time with his father and stepmother and part-time at the leased house. Defendant kept most of his clothes and other possessions at his father's house, and ate most of his meals there.

opportunity to view the gun when Starrett first brought it to the leased house. One of the defense witnesses, Joseph Williford, testified that defendant and he were barbecuing hamburgers when Starrett drove up and took the shotgun out of his car. Starrett held up the gun and said it did not work, but that he was going to try and get it fixed. Williford said that defendant did not handle the gun on that occasion, and that he never saw the gun again.

## II. ADMISSION OF "OTHER ACTS" EVIDENCE UNDER RULE 404(b)

Before trial Ridlehuber's counsel moved in limine for an order directing the government to refrain from offering or alluding to evidence of drug manufacturing by defendant. Such evidence, defendant argued, should be excluded under Federal Rule of Evidence 404(b) as evidence of an extrinsic offense offered to prove that he was a person of bad character.[7] Defendant also argued that even if the drug-related evidence was relevant, its probative value was substantially outweighed by the danger of unfair prejudice. The trial court denied defendant's motion and overruled similar objections interposed by defendant at trial. On appeal, defendant argues that the extrinsic offense evidence was prejudicial, and that the district court erred by overruling his repeated objections and by failing to articulate probative value/prejudice findings before admitting the challenged evidence.

---

[7] Rule 404(b) states: "Other crimes, wrongs, or acts. Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b).

One of the dangers inherent in the admission of "other acts" evidence is that the jury might convict the defendant "not for the offense charged but for the extrinsic offense." United States v. Beechum, 582 F.2d 898, 914 (5th Cir. 1978), cert. denied, 99 S.Ct. 1244 (1979). "This danger is particularly great where, as here, the extrinsic activity was not the subject of a conviction; the jury may feel that the defendant should be punished for that activity even if he is not guilty of the offense charged." Id. To guard against this danger, Rule 404(b) excludes extrinsic offense evidence when it is relevant solely to the issue of the defendant's character. Even if the extrinsic act evidence is probative for "other purposes" recognized by Rule 404(b), such as showing motive or intent, the probative value of the evidence must be weighed against its prejudicial impact.

The government says that Rule 404(b) is inapplicable here because the challenged evidence--the chemicals and other indicia of drug manufacturing--was not extrinsic. Rather, because the drug-related items found in Ridlehuber's house are commonly found in drug labs, those items were "inextricably linked" with the contraband weapon. In the government's view, such evidence is admissible to allow the jury to evaluate all of the circumstances under which the defendant acted. In making this argument, the government relies on a line of precedent which holds that "[e]vidence of an uncharged offense arising out of the same transactions as the offenses charged in the indictment is not extrinsic evidence within the meaning of Rule 404(b), and is

9

therefore not barred by the rule." United States v. Maceo, 947 F.2d 1191, 1199 (5th Cir.), cert. denied, 112 S. Ct. 1510 (1992).

The government's reliance on this line of cases is misplaced. In Maceo, the offense charged in the indictment was conspiracy to import and possess cocaine with intent to distribute it. Maceo, 947 F.2d at 1193. The evidence of uncharged offenses admitted at trial was that one of the defendants, an attorney, used cocaine with the drug traffickers and accepted cocaine as legal fees for services he rendered in connection with the drug conspiracy. Id. at 1198. This "other acts" evidence was part and parcel of the conspiracy itself. The defendant's use of cocaine with the drug traffickers helped prove that the defendant knew about the drug conspiracy, and the cocaine-for-legal-advice arrangement actually advanced the conspiracy. Thus, we held that the challenged evidence "was not extrinsic; it was 'inextricably intertwined with the evidence used to prove the crime charged, [and] is admissible so that the jury may evaluate all of the circumstances under which the defendant acted.'" Id. (quoting United States v. Randall, 887 F.2d 1262, 1264 (5th Cir. 1989).[8]

---

[8]  The defendant in Randall negotiated by telephone the sale of two kilograms of cocaine. Drug enforcement agents monitored and taped the telephone transaction. Randall, 887 F.2d at 1264. The tape, which contained admissions by the defendant of his involvement in other crimes, was admitted in evidence and heard by the jury. Quite literally, the evidence of uncharged offenses arose out of the same transaction as the offense charged in the indictment, and thus was not extrinsic evidence within the meaning of Rule 404(b). See also United States v. Kloock, 652 F.2d 492, 495 (5th Cir. 1981) (false driver's license part of same transaction when found in possession of defendant who attempted to smuggle cocaine through customs).

The connection here between the offense charged in the indictment and evidence of the uncharged offense is not so clear. We cannot say, for example, that the drug-related evidence arose out of the weapons charge. On the contrary, under the prosecution's theory of the case the opposite was true. The government argued that the shotgun was just a cog in the wheel of a larger criminal enterprise: a clandestine drug lab. The problem is that the government did not prove the existence of a drug lab-- it did not have sufficient evidence to do so. If the proof were reversed and Ridlehuber was charged with and convicted of running a drug lab, with the shotgun admitted over objection, the result might be different. Under that scenario, the sawed-off shotgun--a weapon commonly found in illegal drug labs--might fairly be characterized as "intrinsic" evidence since possession of the gun could be said to arise out of the same transaction as the offense charged. Cf. United States v. Hughes, 441 F.2d 12, 20 (5th Cir.), cert. denied, 92 S.Ct. 156 (1971) (although uncharged, guns admissible because they were as much a part of overall counterfeiting operation as printing press). But the government did not charge Ridlehuber with running a drug lab and the evidence adduced at trial did not prove the existence of a clandestine lab. Thus, we cannot allow the prosecution's unproven drug lab theory dictate what is and is not extrinsic of the charged offense.

Furthermore, this is not a situation in which the "other acts" evidence falls outside of Rule 404(b)'s purview because the

11

evidence of the charged and uncharged offenses both were part of a "single criminal episode."  See, e.g., <u>United States v. Carpenter</u>, 963 F.2d 736, 742 (5th Cir.), <u>cert.</u> <u>denied</u>, 113 S.Ct. 355 (1992) (where defendant hid gun and crack pipe under seat of police cruiser, evidence that crack pipe found beside firearm not extrinsic because both part of single criminal episode); <u>United States v. Torres</u>, 685 F.2d 921, 924-25 (5th Cir. 1982) (sample transactions not extrinsic because they "were necessary preliminaries to the larger sale that led to defendants' arrests").  The only "criminal episode" proven here was possession of a short-barreled shotgun.  The rest is conjecture.

Having determined that the chemicals and other indicia of drug manufacturing was extrinsic offense evidence, we must decide whether the trial court should have excluded it.  In <u>Beechum</u>, 582 F.2d at 911, this Court outlined a two-step test to determine the admissibility of extrinsic evidence under Rule 404(b).  Evidence of extrinsic acts is admissible if, as required by Rule 404(b), the evidence is relevant to an issue other than the defendant's character, and if, as Rule 403 requires, its probative value is not substantially outweighed by its prejudicial impact.  Subsequently, in <u>United States v. Robinson</u>, 700 F.2d 205, 213 (5th Cir. 1983), we held that "an on-the-record articulation by the trial court of <u>Beechum's</u> probative value/prejudice inquiry [is required] when requested by a party."

12

The trial court did not articulate its findings on the record with respect to the extrinsic offense evidence.[9]  If a request for on-the-record findings was made, the district court's "[f]ailure to make such findings necessitates remand 'unless the factors upon which the probative value/prejudice evaluation were made are readily apparent from the record, and there is no substantial uncertainty about the correctness of the ruling." United States v. Zabaneh, 837 F.2d 1249, 1262 (5th Cir. 1988) (quoting Robinson, 700 F.2d at 213).  It is debatable whether a request for on-the-record findings was made in this case.  We need not decide that issue, however, because application of the two-part Beechum analysis mandates remand in any event.

Beechum requires that we first determine whether the extrinsic offense evidence is relevant to an issue other than the defendant's character.  Beechum, 582 F.2d at 911.  To make that determination, the Court must address the threshold question of whether the government offered sufficient proof demonstrating that the defendant committed the alleged extrinsic offense.  Id. at 913; Zabaneh, 837 F.2d at 1262.  "If the proof is insufficient, the judge must exclude the evidence because it is irrelevant."

_____

[9]  Apparently, the trial court ruled on defendant's Rule 404(b) motion at a brief, off-the-record sidebar conference that occurred after opening statements but before the prosecution's case-in-chief.  Based on the parties' description of this sidebar conference, the district court's ruling would not have satisfied Robinson even if it had been on-the-record.  The court did not make any findings as to the relevancy of the drug-related evidence or whether the probative value of the evidence was substantially outweighed by its prejudicial effect.  The court merely denied defendant's motion after hearing counsels' arguments.

13

Beechum, 582 F.2d at 913. Rule 104(b) supplies the standard for determining the admissibility of extrinsic offense evidence: "the preliminary fact can be decided by the judge against the proponent only where the jury could not reasonably find the preliminary fact to exist." Id.

Here, the government did not prove, or attempt to prove, that Ridlehuber's possession of the chemicals and other items, such as thermometers, tubing, a Pyrex funnel, and rubber stoppers, was in itself an illegal act. Rather, the government presented testimony, through multiple witnesses, that possession of such materials is indicative of the illegal manufacture of methamphetamine or amphetamine. The question we must decide, therefore, is whether the government put forth sufficient evidence to show that Ridlehuber was operating a clandestine drug lab or assembling a lab with the intent to manufacture methamphetamine or amphetamine. We think not.

The evidence of illegal drug manufacture presented by the government was quite weak. No drugs were found. Government agents said Ridlehuber's residence smelled like a drug lab, but that evidence alone is hardly sufficient. The chemicals found in Ridlehuber's residence and his father's shop can be used to make methamphetamine or amphetamine, but two precursor chemicals necessary for the manufacture of those drugs were not found. What is more, and what is crucial, all the chemicals had legitimate uses in Ridlehuber, Sr.'s metal plating business. In fact, except for three drums of monomethylamine for which he lacked the proper

14

permit, the government returned all the chemicals to Ridlehuber, Sr. This evidence is not sufficient under Rule 104(b) to show that Ridlehuber committed the extrinsic offense. Therefore, the trial court should have excluded the drug-related evidence.

Even if the government's proof had satisfied Rule 104(b) and the district court found the extrinsic offense relevant, the evidence should have been excluded under the Rule 403 balancing inquiry embodied in second step of the Beechum test. "[T]he central concern of rule 403 is whether the probative value of the evidence sought to be introduced is 'substantially outweighed by the danger of unfair prejudice.'" Id. The drug-related evidence was probative on the issue of motive; it explained why Ridlehuber might have a sawed-off shotgun in his residence. Yet the shotgun itself undercut the credibility of the prosecution's theory that Ridlehuber possessed the gun to protect a drug lab (and thus diluted the probative value of the "other acts" evidence). The gun at issue cannot be cocked without a tool, such as a pen or screwdriver--hardly the weapon of choice in a gunfight.

The danger of unfair prejudice from admission of the drug-related evidence, by contrast, was great. The clandestine manufacture of controlled substances like methamphetamine and amphetamine is the kind of offense for which the jury may feel the defendant should be punished regardless of whether he is guilty of the charged offense. Cf. Kloock, 652 F.2d at 495 (false driver's license "highly probative" of drug smugglers attempt to conceal his identity while carrying false license not kind of offense likely to

15

inflame jury's passions against defendant).  And this is not a case like United States v. Aleman, 592 F.2d 881, 886 (5th Cir. 1989), where the prejudicial effect of extrinsic offense evidence was mitigated by the government's presentation of "substantial evidence of [] guilt in addition to the challenged evidence."  The weapons-charge evidence here was not particularly strong mainly because the shotgun itself was not blatantly shortened, and there was no evidence that Ridlehuber ever handled the shotgun or inspected it closely.[10]

Furthermore, the prejudicial impact of the drug-related evidence was magnified by the prosecution's focus on that evidence. A significant portion of the total volume of testimony heard by the jury concerned drug manufacturing, and one witness testified exclusively about such activity.  See Zabaneh, 837 F.2d at 1265 (danger of unfair prejudice exacerbated when testimony focused on extrinsic offense and one witness's testimony pertained entirely to extrinsic offense).  Under these circumstances, the trial court's instructions to the jury about the limited use of the extrinsic offense evidence was not sufficient to alleviate any unfair prejudice that may have resulted from admission of that evidence.

Contrary to the government's assertion, United States v. Smith, 930 F.2d 1081 (5th Cir. 1991) is not controlling here.  The defendant in Smith was convicted of illegal possession of firearms.

---

[10] According to Ridlehuber, Sr.'s testimony, even the law enforcement personnel who seized the shotgun were not sure that its dimensions were illegal.  On the day of the search, the officers borrowed a tape measure from Ridlehuber, Sr. to check barrel length and overall length of the shotgun.

16

State police seized the guns during a search of a house in which the defendant lived. Smith, 930 F.2d at 1083. Probable cause for the search derived from the odor of amphetamine outside the house. Id. at 1087 n.4. During the trial defense counsel suggested to the jury that the government had no basis to conduct the search that led to the seizure of six guns. Id. Although it had previously refused to admit the extrinsic offense evidence, the trial court allowed the government to present evidence of drug dealing, including that officers detected the odor of an amphetamine precursor, to counter defense counsel's suggestion.

On appeal, the defendant claimed that the drug-related testimony should have been excluded under Rule 402 and 403. We affirmed Smith's conviction, noting that any prejudice resulting from the drug-related evidence "was overcome by its intimate connection with the officers' motives for obtaining warrants" to search the premises. Id. at 1087. Since the defendant called into question the basis for the search, we held that the extrinsic act evidence was "necessary to inform the jury of the circumstances of Smith's offense." Id.[11] Unlike Smith, where exclusion of the extrinsic offense evidence would have "distorted the jury's view of the offense" charged, Id., there are no special circumstances warranting admission of the drug-related evidence in this case. Indeed, admission of the extrinsic offense evidence here unfairly

---

[11]The dissent quotes liberally from Smith but fails to grapple with this key factor supporting our conclusion in Smith that admission of the drug evidence did not run afoul of Rule 403.

17

prejudiced defendant and compels reversal of the conviction and remand for a new trial.

Finally, in contrast to the instant case, the circumstances presented in United States v. Quintero, 872 F.2d 107 (5th Cir. 1989) did not warrant exclusion of the other acts evidence. There, we upheld the trial court's admission of drug-related evidence in affirming the defendant's conviction for possession of a firearm. The other acts evidence in Quintero was not a major focus of the government's case as it was here. Indeed, in Quintero, the prosecution took pains to limit reference to the drug evidence and made no attempt to link the defendant with the heroin found on him and in his companion's apartment. Id. at 113. And unlike this case, the evidence in Quintero supporting the underlying weapons charge was "overwhelming." Id. In light of this overwhelming proof on the weapons charge, we observed that even if the trial judge abused his discretion by admitting the drug evidence, "such error would be harmless . . ." Id. 113-14.

In sum, if we hold that the drug related evidence in this case is not extrinsic, the exception to Rule 404(b) embodied in the "inextricably intertwined" analysis will swallow the rule. This is so considering (1) the weakness of the proof of drug offenses; (2) the weakness of the link between the drug offenses and the particular weapon, which was not very useful for its purported purpose; and (3) the barely adequate proof of defendant's possession of the weapon, which makes the impact of the drug

evidence so much greater.  Under these circumstances, Rule 404(b) prevents the government from bootstrapping evidence into this case.

## II. JENCKS ACT

Defendant also challenges the admission of testimony from government witnesses John Haigood, a McLennan County deputy sheriff, and Robert Wilkerson, a sergeant investigator with the Texas Department of Public Safety.  Defendant maintains that the testimony of these witnesses violated Fed.R.Crim.P. 16(a)(1)(C) and the Jencks Act, 18 U.S.C. § 3500.  We disagree.

First, defendant complains that Deputy Haigood was permitted to testify that he found the AR-15 ammunition clip on the same shelf where another officer found the sawed-off shotgun.  Defense counsel objected to Haigood's testimony because, although he had seen the clip during discovery, he was not told where the clip was found.  Defendant, who quotes Fed.R.Crim.P. 16(a)(1)(C) without further elaboration, asserts that the trial judge erred in overruling the objection.[12]

---

[12]  Federal Rule of Criminal Procedure 16(a)(1)(C) provides:

> Upon request of the defendant the government shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, which are within the possession, custody or control of the government, and which are material to the preparation of the defendant's defense or are intended for use by the government as evidence in chief at the trial, or were obtained from or belong to the defendant.

19

The disputed testimony, which consists of Haigood's recollection of events during the search of defendant's residence, is not subject to discovery under Rule 16(a)(1)(C). That rule relates to discovery of documents or tangible objects, and does not require the government to give advance notice of the expected testimony of its witnesses. See United States v. Martinez-Mercado, 888 F.2d 1484, 1489-90 (5th Cir. 1989). Rule 16 says quite plainly that the only witness statements subject to disclosure are those required by the Jencks Act. Fed.R.Crim.P. 16(a)(2). The Act is irrelevant here because Haigood did not prepare an investigative report, nor was he required to do so. Martinez-Mercado, 888 F.2d at 1490 (prosecution not required to create Jencks material by demanding that its witnesses put in writing every matter about which they intend to testify) (citations omitted).

Second, defendant protests a portion of Sergeant Investigator Wilkerson's testimony on rebuttal, which came after defense counsel's Jencks motion requesting the government to produce any "statements" made by Wilkerson. In his rebuttal testimony, Wilkerson spoke about conversations he had with defendant's father in which Ridlehuber, Sr. said his son once had been involved with drugs. Furthermore, Wilkerson quoted defendant's father as saying: "there is something strange going on around here, and I'm not so sure my son's not involved." The content of Wilkerson's conversations with defendant's father were not memorialized in an offense report, but the second statement was apparently recorded verbatim in Wilkerson's field notes. It appears from the record

20

that Wilkerson had the notes with him during his testimony, and defendant does not allege that trial counsel was prevented from reviewing them.

Defendant contends that the prosecution's failure to produce Wilkerson's field notes before his rebuttal testimony violates the Jencks Act.[13] The Act defines the term "statement" in relevant part as "a written statement made by said witness and signed or approved by him." 18 U.S.C. § 3500(e)(1). Under Martinez-Mercado, 888 F.2d at 1490, the government was not necessarily required to have Wilkerson memorialize his conversations with Ridlehuber, Sr. in an offense report that is covered by the Jencks Act. More to the point, we previously held that scattered notes taken during the course of an investigation "do not fit within the [Jencks] Act's purview." United States v. Ramirez, 954 F.2d 1035, 1038 (5th Cir.), cert. denied, 112 S.Ct. 3010 (1992). Therefore, the trial court was not required to prohibit Wilkerson's testimony.

_____

[13] The portion of the Jencks Act on which defendant relies reads:

> After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement related to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination.

18 U.S.C. § 3500(b).

### III. APPLICATION OF § 5861(d) TO DEFENDANT

Defendant was convicted under 28 U.S.C. § 5861(d), which makes it unlawful for any person "to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record."  Defendant argues that his conviction under § 5861(d) violates due process guaranteed him by the Fifth Amendment because the government would have rejected his application had he made one since the law precludes registration of the firearm in question.  In support of this argument, defendant cites United States v. Dalton, 960 F.2d 121 (10th Cir. 1992), and "Publication 603," a 1974 publication from the Bureau of Alcohol, Tobacco and Firearms ("ATF").

In Dalton, the Tenth Circuit analyzed the relationship between 18 U.S.C. § 922(o), enacted in 1986 to outlaw the possession of any machinegun after its effective date, and § 5861(d), which imposes tax and registration obligations for certain firearms, including machineguns.  The defendant in Dalton was convicted under § 5861(d) & (e), respectively, for possessing and transferring an unregistered machinegun made after the effective date of § 922(o). Id. at 122.  The court held that due process barred the defendant's conviction because § 5861(d) mandated the registration of a firearm that the government refused to register due to the ban on machineguns imposed by § 922(o).  In other words, the court concluded that compliance with both statutes is impossible.  Id. at 122-23; contra United States v. Jones, 976 F.2d 176, 182-83 (4th Cir.), cert. denied, 113 S.Ct. 2351 (1993).

22

Regardless of whether <u>Dalton</u> embodies a correct statement of the law, it offers no help to defendant, who was convicted of possessing a short-barreled shotgun, not a machinegun. Unlike newer machineguns, short-barreled shotguns still may be possessed legally if registered properly. <u>See</u> 18 U.S.C. §§ 921-928. Thus, even if <u>Dalton</u> is correct as to the class of machineguns made illegal by § 922(o), the Tenth Circuit's reasoning in <u>Dalton</u> does not encompass short-barreled shotguns, which can be possessed legally under federal law if registered. <u>United States v. Aiken</u>, 974 F.2d 446, 448-49 (4th Cir. 1992).

Without <u>Dalton</u>, defendant's argument rests on ATF "Publication 603," which correctly states that private citizens in possession of unregistered firearms cannot register them.[14] Under the statutory scheme, the transferor must register the weapon in the name of the transferee <u>before</u> delivery; only then may delivery occur lawfully. <u>United States v. Coleman</u>, 441 F.2d 1132, 1133 (5th Cir. 1971). Thus, it is true that a transferee may be prosecuted for possessing an unregistered firearm even though he himself cannot comply with the registration requirement. <u>United Stats v. Bright</u>, 471 F.2d 723, 726 (5th Cir.), <u>cert. denied</u>, 93 S.Ct. 2742 (1973); <u>United States v. Sedigh</u>, 658 F.2d 1010, 1012 (5th Cir.), <u>cert. denied</u>, 102

---

[14] The substance of the passage quoted in defendant's brief reflects current ATF regulations. <u>See</u> 27 C.F.R. 179.84-86, 179.101(b), (f).

23

S.Ct. 1279 (1982) (statutory scheme requires that transferee not take possession until transfer and registration approved). According to defendant, this result offends due process.

This Court disagrees. As we explained some years ago in United States v. Ross, 458 F.2d 1144, 1145 (5th Cir.), cert. denied, 93 S.Ct. 167 (1972):

> Section 5861(d) making possession of an unregistered weapon unlawful is part of the web of regulations aiding enforcement of the transfer tax provision in [26 U.S.C.] § 5811. Having required payment of a transfer tax and registration as an aid in collection of that tax, Congress under the taxing power may reasonably impose a penalty on possession of unregistered weapons. Such a penalty imposed on transferees ultimately discourages the transferor on whom the tax is levied from transferring a firearm without paying the tax.

Through this statutory scheme, Congress encourages compliance by rendering as contraband any firearm transferred without prior registration, Aiken, 974 F.2d at 448, and "no transferee can 'purify' the 'tainted' weapon by registering it after transfer." United States v. Aiken, 787 F. Supp. 106, 108 (D. Md. 1992). While defendant may dispute the fairness or efficacy of this enforcement mechanism, "[t]he requirement that a transferee must refuse to accept possession of an unregistered firearm is rationally designed to aid in the collection of taxes imposed by other provisions of the Act." Id., aff'd, 974 F.2d 446 (5th Cir. 1992).

24

In sum, § 5861(d) is not unconstitutional as applied to defendant.[15]

We REVERSE the judgment of conviction and REMAND the case to the District Court.


EMILIO M. GARZA, Circuit Judge, dissenting:


The majority holds that, in a prosecution for possession of an unregistered short-barrel shotgun in violation of 26 U.S.C. § 5861(d), "chemicals and other indicia of drug manufacturing[16]

---

[15]    In addition to asserting a sufficiency of the evidence challenge, Ridlehuber claims his trial counsel failed to provide him constitutionally effective assistance and that the court misapplied the sentencing guidelines.  Having decided to remand for a new trial, we need not address these issues.

[16]        During  the search of a house leased by Harold Ridlehuber, Sr., for the use of his son, the defendant, officers found a short-barreled Stevens Savage 20-gauge shotgun resting on an open shelf in the kitchen.  Next to the shotgun, the officers found an ammunition clip for a Colt AR-15 rifle.  In another part of the house the officers found a Mossberg 20-gauge shotgun of legal length standing upright against a wall quite near a door, two more AR-15 clips and a box of 20-gauge shells.  A few 20-gauge casings were found ont he driveway.  In addition to the weapons, the officers found the following:  a drum containing 230 pounds of sulfuric acid, two gallons of ether, a can of ether starting fluid, a pan containing aluminum shavings, a hot plate, tubing, a Pyrex funnel, thermometers, and rubber stoppers.

Search warrants were also executed at Ridlehuber, Sr.'s home and at his place of business, a Hillsboro metal plating shop where defendant worked with his father.  In Ridlehuber, Sr.'s house was a Colt AR-15 rifle and magazines, which Ridlehuber, Sr. said belonged to his son.  At the business office, agents seized numerous chemicals including phenylacetonitrile, ethyl acetate, sodium hydroxide, monomethylamine, ether, muriatic acid, acetone, and reagent alcohol.  In defendant's truck, parked at his father's office, was a loaded .45 caliber pistol.

Slip op. at 2.

25

[obtained pursuant to lawful search warrants] was extrinsic offense evidence" under Rule 404(b) of the Federal Rules of Evidence, slip op. at 12, and concludes that "admission of th[is] extrinsic offense evidence . . . unfairly prejudice[d] defendant and compels reversal of the conviction and remand for a new trial." *Id.* at 17-18. Because our circuit's well-established jurisprudence supports the opposite conclusion))that such evidence is not extrinsic evidence under Rule 404(b), but rather intrinsic circumstantial evidence of knowledge and possession of the shotgun))I respectfully dissent.

Harold Ridlehuber, Jr. was convicted of possession of an unregistered short-barreled shotgun, in violation of 26 U.S.C. § 5861(d). Section 5861(d) requires that certain firearms,[17] including short-barreled shotguns, be registered in the National Firearms Registration and Transfer Act.[18] *See* 26 U.S.C. §§ 5845, 5861(d). Under this statutory scheme, the transferor must register the weapon in the name of the transferee *before* delivery; only after registration may delivery occur lawfully. *See United States v. Coleman,* 441 F.2d 1132, 1133 (5th Cir. 1971).

The statute makes it unlawful for any person

---

[17] Section 5845 states:

For the purpose of this chapter))

**(a) Firearm.**))The term "firearm" means . . . ; (2) a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length.

[18] Section 5861 states:

It shall be unlawful for any person))
. . . .
(d) to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record[.]

> "to receive or possess a firearm which is not
> registered to him." 26 U.S.C. § 5861(d). The
> "only knowledge required to be proved [is]
> that the instrument . . . was a firearm."
> *[United States v.] Freed,* 401 U.S. [601,] 607,
> 91 S. Ct. [1112,] 1117 [(1971)]. Similarly,
> to establish an unlawful transfer, 26 U.S.C.
> § 5861(e), mere knowledge that the instrument
> was a firearm is sufficient. It is not
> necessary in either case that the charged
> party know that his reception, possession, or
> transfer of the firearm violated the Act.

*United States v. Moschetta,* 673 F.2d 96, 100 (5th Cir. 1982).[19] "As used in the Act, the word `firearms' is a term of art that includes primarily weapons thought to be of a military nature and of no legitimate use for sport or self-defense." *United States v. Anderson,* 885 F.2d 1248, 1250 (5th Cir. 1989) (en banc). Although the Act requires no specific intent or knowledge that a firearm was unregistered, *see Freed,* 401 U.S. at 607, 91 S. Ct. at 1117, "we [have] concluded that a conviction should require that the charged party kn[o]w it was a `firearm' in the *Act* sense, not that he (or

---

[19] The district court correctly instructed the jury:

For you to find the defendant guilty of this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt:

First :     That the defendant knew he had the gun described in the indictment in his possession;
Second:     That the guns [sic] was a weapon made from a shotgun and had an overall length of less than 26 inches or a barrel of less than 18 inches in length;
Third:      That the defendant knew of the characteristics of the gun, e.g. that the weapon was a shotgun having an overall length of less than 26 inches or a barrel of less than 18 inches in length;
Fourth:     That this gun was or could readily have been put in operating condition; and
Fifth:      That this gun was not registered to the defendant in the National Firearms Registration and Transfer Record. It does not matter whether the defendant knew that the gun had to be registered."

Record on Appeal at 109; *see also 5th Circuit Pattern Jury Instructions* 199 (Criminal Cases) (1990).

she) merely kn[o]w it was a firearm [in the ordinary sense]." *Anderson,* 885 F.2d at 1251. In establishing this limited *mens rea,* we recognized that in most cases knowing possession of a "firearm" in the *Act* sense will be provable if it exists because "a jury can ordinarily infer knowledge of their nature from the possession of such illegal items and the surrounding circumstances." *Id.* at 1255 n.13. The majority excludes any inference of knowledge or possession "from . . . the surrounding circumstances."

Rule 402 is the "baseline" of the Federal Rules of Evidence. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 113 S. Ct. 2786, 2793 (1993). "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible." Fed. R. Evid. 402. Rule 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. "The rule's basic standard of relevance thus is a liberal one." *Daubert,* 113 S. Ct. at 2794.

In *United States v. Smith,* 930 F.2d 1081 (5th Cir. 1991), a case extremely similar to the facts here, we held that a district court's decision to admit drug-related evidence where the defendant was charged with federal firearms violations did not run afoul of Rules 402 or 403 of the Federal Rules of Evidence. *Id.* at 1087.

As in the instant case, a house occupied by Smith was searched pursuant to a search warrant for drugs.

> The odor of amphetamine permeated the house, and six guns, four of them loaded, were recovered from various rooms. Glassware and condenser tubes known to be used in the manufacture of amphetamine were stashed in an upstairs closet and later determined to bear the fingerprints of both the defendant and Randy Smith.

*Id.* at 1083-84.[20] "[A] federal grand jury returned a three count indictment charging the defendant with federal arms violations."[21] *Id.* at 1084. Smith claimed that drug-related testimony should have been excluded as irrelevant under Fed. R. Evid. 402 or as unfairly prejudicial under Rule 403. *Id.* at 1087. We held, however, that the district court's decision to admit this evidence "did not run afoul of Rule 402." *Id.*

> Evidence of drug dealing was undoubtedly relevant here. In this Circuit, *the jury is permitted to view and consider the entire circumstances surrounding an alleged offense.* Thus, in *United States v. Randall,* 887 F.2d 1265 (5th Cir. 1989), the defendant was charged with carrying a firearm during *cocaine* trafficking. Yet this court held that evidence regarding *marijuana* dealing was admissible, because evidence which is "inextricably intertwined with . . . evidence used to prove the crime charge is admissible so that the jury may evaluate all of the circumstances under which the defendant acted. *Id.* at 1268; *see also United States v. Sepulveda,* 710 F.2d 188, 189 (5th Cir. 1983).

*Id.* (emphasis added).

As the majority acknowledges, the drug-related evidence found in Ridlehuber's house was relevant "to provide an explanation for

---

[20]     *Compare supra* n.1.

[21]     Smith was charged as a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), and was subject to a sentence enhancement pursuant to 18 U.S.C. § 1924(e)(1) because he had previously been convicted of three violent felonies or serious drug offenses.

why the gun was in the house." Slip op. at 3. The challenged evidence served exactly this purpose, as "[t]he evidence relating to drugs provided a motive for the defendant's possession of the shotgun." *Id.* This is particularly true given our recognition that guns are "tools of the trade." *United States v. Goff,* 847 F.2d 149, 175 (5th Cir.) (attribution omitted), *cert. denied,* 488 U.S. 932, 109 S. Ct. 324, 102 L. Ed. 2d 341 (1988).

Although it acknowledges the relevance of the drug-related evidence, the majority holds that such evidence constituted extrinsic offense evidence under Fed. R. Evid. 404(b). Rather than citing authority to support its holding, the majority distinguishes the instant case from cases such as *United States v. Maceo,* 947 F.2d 1191 (5th Cir. 1992), where we held that "[e]vidence of an uncharged offense arising out of the same transactions as the offenses charged in the indictment is not extrinsic evidence within the meaning of Rule 404(b), and is not therefore barred by the rule." *Id.* at 1199. Based on this language in *Maceo,* the majority would limit the term "intrinsic" to offenses which "ar[i]se out of the [charged offense]." Such analysis is legally unconvincing and has no support in our prior jurisprudence.

In *United States v. Quintero,* 872 F.2d 107, 108 (5th Cir. 1989), *cert. denied,* 110 S. Ct. 2586 (1990), law enforcement officials obtained a search warrant pursuant to the defendant's arrest for possession of heroin, and upon searching the apartment, found heroin, drug paraphernalia, and two rifles. The defendant was indicted on two separate counts for being a three-time

convicted felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1), 924(e)(1). *See id.* at 113. In upholding the trial court's evidentiary ruling allowing the drug-related evidence at trial, we did not inquire whether the drug-related evidence "arose out of" of the weapons charges. We instead recognized that the trial court did not abuse its discretion in admitting the evidence where "the officer's search for heroin was part and parcel of the general description of events leading to [the defendant's] arrest and the discovery of the weapons." *Id.* We therefore found the drug-related evidence to be "inextricably intertwined with the offense charged," even though the drug-related evidence did not "arise out of" the weapons charges. *Id.*

Accordingly, I would hold that the drug-related evidence here was not extrinsic offense evidence under Rule 404(b).