United States Court of Appeals
Fifth Circuit

**F I L E D**

**March 14, 2007**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 06-10204

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MICHAEL McDADE,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Texas

Before GARWOOD, WIENER, and CLEMENT, Circuit Judges.

GARWOOD:[1]

Michael McDade (McDade) appeals his conviction for bank robbery and for "use and carry of a firearm," violations of 18 U.S.C. §§ 2113(a) and 924(c). His sole contention on appeal is that the trial court reversibly erred by allowing the government to cross-examine his wife about his alleged, uncharged drug use. We assume, *arguendo*, that the district court erred but, finding the

---

[1] Per 5th Cir. R. 47.5, the court has decided that this opinion should not be published and is not precedent except under those limited circumstances set forth by 5th Cir. R. 47.5.4.

claimed error clearly harmless, we affirm.

## FACTS AND PROCEEDINGS BELOW

Around 12:30 p.m. on January 8, 2005, a man wearing dark clothes, a dark hat, and eyeglasses walked into the Wachovia Bank at 6000 Harris Parkway, Fort Worth, Texas (Wachovia). He approached Wachovia teller James Todd Mayo (Mayo) and gave Mayo a note reading: "Attention teller, put 100s, 20s, 50s, 10s in bag. No ink or funny money. This is not a joke. You have two minutes. Quiet. Push no buttons." After Mayo handed him a bag filled with cash, the robber displayed a gun and told Mayo, "I just want to let you know this is for real." The robber left Wachovia with over $2,000.00.

On January 11, 2005, the robber's photograph, taken by Wachovia's surveillance camera, was published in a Crime Stoppers bulletin in the Fort Worth Star Telegram newspaper. Evidence was received without objection that the Fort Worth Police Department subsequently received two phone calls (from unidentified persons) identifying McDade as the person shown in the photograph.

On April 18, 2005, Fort Worth Police Officer Don Owings (Officer Owings) reviewed the case file. Officer Owings testified that, after seeing the Crime Stoppers tip, he compared the robber's physical description given in the bank teller's offense report with information known about McDade and found similarities. Officer Owings next obtained McDade's photo. Noting a likeness to the

2

individual in the bank surveillance photos, Officer Owings placed McDade's photo and five other photographs in a six-person photospread to show to Wachovia teller Mayo. Mayo picked out McDade's photo as the robber. Officer Owings next showed three bank surveillance photos of the robber to Marcie Hearn, who knew McDade and who identified him as the individual in the bank surveillance pictures. Hearn was McDade's state parole officer, but that particular information was not before the jury.

Officer Owings arrested McDade on May 2, 2005. A subsequent search of McDade's home failed to uncover any item connected to the robbery. Samples of McDade's handwriting were submitted to the FBI's Questioned Documents Unit, but the FBI was unable to determine whether McDade wrote the bank robber's demand note.

On June 15, 2005, a federal grand jury returned a two-count indictment against McDade: Count One charged him with bank robbery, a violation of 18 U.S.C. § 2113(a), and Count Two charged him with "Use and Carry of a Firearm," a violation of 18 U.S.C. § 924(c)(1)(A)(ii). McDade pleaded not guilty. A trial occurred on September 12 and 13, 2005, but ended in jury deadlock. The case was tried again on October 11, 2005.

At the second trial, McDade's defense included several witnesses' testimony: Glenview Baptist Church Pastor Roger Hollar (Pastor Hollar) testified that on Friday, January 7, 2005, he met with McDade at the church office, where he arranged to help McDade

with his car payment.  Pastor Hollar further testified that, also on January 7, 2005, McDade received groceries from his church and that, on January 17, 2005, the church helped McDade pay his utilities bill.  McDade's aunt and mother both testified that they had never seen McDade wear the type of clothes worn by the bank robber in the surveillance photos, and McDade's wife testified that McDade did not own such clothes.  McDade's aunt Edna Chiles (Chiles) testified that McDade met her and his mother at Chiles's house around 12:00 noon on January 8, 2005, stayed anywhere from 10 to 20 minutes, and then went with Chiles and McDade's mother to McDade's mother's house to pick up food.  Chiles testified that, after McDade left, she and McDade's mother sat around and talked before going to church, arriving at church by 2:00 p.m.  McDade's mother similarly testified.  Chiles testified further that McDade did not look like the person in the bank surveillance photo because of different facial features and differently shaped eyeglasses.

Also during the defense's case-in-chief, McDade's wife, Gwendolyn McDade, stated that she and McDade were experiencing financial difficulties at the time of the robbery.  She answered in the negative when, on direct, defense counsel asked whether McDade had any unexplained money around the time of the robbery or whether their financial situation had improved at all:

> "Q. Did you notice a change in your finances
> after January the 8th?
> A. No, sir.
> Q. Did Michael show up with any money he

couldn't explain where he got it?
A. No, sir.
Q. Did he show up with any money at all?
A. No, sir.
Q. Did he buy anything that you knew about that he couldn't explain how he bought it?
A. No, sir.
Q. Were your finances still just as tight as they were after January 8th as they were before?
A. Yes, sir."

After defense counsel finished direct examination of Mrs. McDade, the prosecutor asked to approach the bench. The following discussion occurred out of the jurors' hearing:

"[Prosecutor]: Judge, I believe he's opened the door to his drug use. I have a good faith belief that he was using cocaine, and that's where the money very well could have gone. He asked her if there was any extra money or anything like that laying around. I have information from the parole officer that he was using cocaine when --
THE COURT: Well, he's opened the door to it so you can have at it.
[Defense Counsel]: I object to that, Your Honor."

The prosecutor then asked McDade's wife, "Ms. McDade, were you aware that your husband was using cocaine during this time period?" McDade's wife replied, "No ma'am." The prosecutor next asked, "Were you aware that he was -- had tested dirty on urinalysis?," to which the witness again responded, "No ma'am." Neither McDade's wife nor any other witness called by him testified as to his character or character for truthfulness. McDade himself did not testify. McDade's purported drug use was never again mentioned. No evidence was presented that McDade ever used or dealt in drugs.

5

No limiting instruction, or instruction to disregard, was given, nor did McDade ever request one.

On October 11, 2005, the jury returned a guilty verdict on both counts of the indictment. The trial court sentenced McDade to consecutive terms of 96 months' imprisonment for the bank robbery charge, and 84 months' imprisonment for the use and carry of a firearm. McDade timely appealed.

## DISCUSSION

We assume, *arguendo* only, that the two drug use questions asked of McDade's wife were improper under *United States v. Beechum*, 582 F.2d 898 (5th Cir. 1978), and its progeny, or that, to the extent potentially properly relevant (in respect to motive or explaining the evidence of McDade not exhibiting post-robbery cash), they were nevertheless improper because they were never connected up by any evidence showing any drug use (or dealing) by McDade. *See, e.g., United States v. Ridlehuber*, 11 F.3d 516, 522 (5th Cir. 1993).[2] We likewise assume, *arguendo* only, that McDade's generic objection was sufficient (*but see United States v. Polasek*,

---

[2]  McDade does not assert on appeal, and did not assert below, that the prosecutor did not "have a good faith belief that he was using cocaine" and "information from the parole officer that he was using cocaine." There is no evidence (apart from McDade's wife's negative answer to the two questions about her knowledge of this) he was *not* then using cocaine. The PSR states (in a portion not objected to by McDade) that "In December 2004, he tested positive for cocaine, according to the defendant" and he "stated he was associating with the wrong people which led to his drug use."

6

162 F.3d 878, 883 (5th Cir. 1998)), and that the failure to ever move to strike the questions or request a limiting instruction (or instruction to disregard) was not fatal to adequate preservation of the objection (*see Huddleston v. United States*, 108 S.Ct. 1496, 1501-02 & n.7 (1988)) because the trial court simply overruled the objection rather than allowing the question conditionally or subject to a proper showing of McDade's drug use or dealing. *See United States v. Anderson*, 933 F.2d 1261, 1273 (5th Cir. 1991).

Nevertheless, it is clear that from the record as a whole that any properly preserved error respecting allowance of the two drug use questions was harmless error under FED. R. CRIM. P. 52(a). *See, e.g., United States v. Williams*, 957 F.2d 1238, 1244 (5th Cir. 1997).

McDade's wife answered the two brief drug-related questions in the *negative*, and there was no other mention by any witness or attorney, during testimony or in argument to or within hearing of the jury, concerning drugs. Conversely, there was strong evidence identifying McDade as the bank robber. Wachovia teller Mayo was unequivocal in his in-court identification of McDade and had ample opportunity to observe him at close range during the robbery. Prior to the robbery, Mayo had been trained "to look at people in the event that there is something that happens to identify them" including "making special note of facial characteristics." Mayo likewise testified as to picking McDade's picture out of the

7

photographic line up, the separate picture being introduced in evidence as well as the entire photographic spread. Hearn testified that she had worked with McDade, helping him get a job and seeing how he was doing at any job he got, and had met with him about ten times. She identified McDade in court. She also identified McDade as the person shown in the bank surveillance photographs and testified that she previously had done so when shown those photographs by Officer Owings. There was no doubt in her mind. The surveillance photographs were introduced in evidence. Officer Owings corroborated Hearn's testimony as to her earlier having identified McDade from the surveillance photographs. Hearn further testified that McDade wore glasses and, though he "was always between jobs," he "dressed real sharp, real sharp."[3] Hearn also testified that she did not see McDade in January 2005, and he missed his January 12, 2005, appointment with her.

McDade points out that the two drug use questions were not asked in his first trial that ended in a hung jury and contends that this fact demonstrates reversible error. However, the two trials' disparate outcomes could as likely have been due to other factors.[4] For example, the record indicates that in the second

_____

[3] Including "nice pants, nice shoes, silk shirts . . . really nice shoes . . . alligator, ostrich . . .," and often wearing a "couple of gold necklaces, gold rings."

[4] The testimony at the two trials was much the same except that Hollar did not testify at the first trial. However, his testimony at the second trial was impeached by confusion as to

8

trial, but not the first, jurors were given individual copies of the bank surveillance photos.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

---

dates.